RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0082p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MARSHALL GARBER,

*Plaintiff-Appellant,*

*v.*

HERIBERTO MENENDEZ, M.D.,

*Defendant-Appellee.*

┐
│
│
│
│
> No. 17-3992
│
│
│
│
┘

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:17-cv-01214—Patricia A. Gaughan, District Judge.

Argued: April 25, 2018

Decided and Filed: May 1, 2018

Before: GUY, SUTTON, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jacob J. Beausay, DONAHEY, DEFOSSEZ & BEAUSAY, Columbus, Ohio, for Appellant. Kevin M. Norchi, NORCHI FORBES LLC, Cleveland, Ohio, for Appellee. Eric E. Murphy, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amicus Curiae. **ON BRIEF:** Jacob J. Beausay, DONAHEY, DEFOSSEZ & BEAUSAY, Columbus, Ohio, for Appellant. Kevin M. Norchi, Brendan M. Richard, NORCHI FORBES LLC, Cleveland, Ohio, for Appellee. Eric E. Murphy, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Amicus Curiae.

_____

## OPINION

_____

SUTTON, Circuit Judge. Minors injured by medical malpractice in Ohio have one year to sue their doctors after they turn eighteen. When Marshall Garber sued Dr. Heriberto

Menendez for malpractice in May 2017, one year had come and gone. But Ohio tolls the statute of limitations if the defendant leaves the State. The clock stopped when Dr. Menendez left Ohio for Florida and stayed stopped when he chose to retire there. That differential treatment of residents and non-residents, says Dr. Menendez, violates the dormant Commerce Clause of the United States Constitution by disincentivizing individuals from leaving Ohio and offering their services (or retirement spending) in other States. But the Ohio tolling provision does not discriminate against out-of-state commerce any more than many other policy benefits reserved for residents of a given State, including the existence of an estate tax for Ohioans but not for Floridians. We reverse.

## I.

In 2010, Dr. Menendez treated fifteen-year-old Garber for a fever, constipation, and back pain. The treatment did not go well. Garber became a paraplegic.

Garber's first two attempts to sue Dr. Menendez failed. The state court dismissed Garber's initial lawsuit because he failed to file an affidavit from an expert witness in support of his claim. *See* Ohio Civ. R. 10(D)(2). In his second lawsuit, Garber tried to serve Dr. Menendez at his Ohio office, but (unbeknownst to him) Dr. Menendez had retired to Florida by then. Garber voluntarily dismissed the lawsuit due to lack of service.

Garber sued Dr. Menendez a third time in May 2017, and properly served him. Garber acknowledged that Ohio provides a one-year statute of limitations for medical malpractice claims. *See* Ohio Rev. Code § 2305.113. And he acknowledged that the limitations period began running on August 5, 2013, when he turned eighteen. *See id.* § 2305.16. But his lawsuit remained timely, he explained, because Ohio tolls the statute of limitations when the defendant "departs from the state." *See id.* § 2305.15. Dr. Menendez left Ohio for Florida in April 2014, and he has not returned.

Dr. Menendez removed the lawsuit to federal court. He filed a motion to dismiss, arguing that Ohio's tolling rules violated the dormant component of the Commerce Clause as applied to him. The district court agreed and dismissed Garber's complaint.

II.

A.

"[A] page of history is worth a volume of logic," *N.Y. Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921), giving us high hopes for the several pages of history that inform today's question.

For the first century and a half of American history, the States could not authorize their courts to impose liabilities upon people over whom they had no control. The "foundation of jurisdiction" being "physical power," *McDonald v. Mabee*, 243 U.S. 90, 91 (1917), a State could not exercise personal jurisdiction over a defendant unless the plaintiff served the defendant with process within the State, where it could exercise physical control over him. *See Burnham v. Superior Court of Cal.*, 495 U.S. 604, 616 (1990).

*Pennoyer v. Neff* converted this common law rule into a constitutional command. It construed the Due Process Clause to mean that one State could not compel a party residing in another State to respond to a lawsuit. 95 U.S. 714, 733 (1877).

The common law rule and *Pennoyer* created a practical problem. Defendants might commit wrongs against a State's residents and avoid liability by leaving the State and waiting for the statute of limitations to expire. *Meyer v. Paschal*, 498 S.E.2d 635, 637 (S.C. 1998). Once a statute of limitations started, it usually did not stop. Many States responded to the problem by enacting laws that tolled the limitations period for out-of-state defendants, whether they fled the jurisdiction in the face of a lawsuit or left innocently for greener pastures. 2 H.G. Wood, A Treatise on the Limitation of Actions at Law and in Equity § 244, at 1143–47 (Dewitt C. Moore, ed., 4th ed. 1916) (collecting statutes).

Ohio joined this crowd early. Seven years after Ohio became a State in 1803, its legislature enacted a law that tolled the statute of limitations "when any person or persons against whom there is cause of action[] shall have left the state." An Act for the Limitation of Actions, ch. 213, § 2 (1810), *reprinted in* 1 The Statutes of Ohio and of the Northwestern Territory 656 (Salmon P. Chase, ed., 1833).

The premises of these policies and constitutional rulings shifted over time. By the early Twentieth Century, new modes of transportation and communication meant that many businesses sold their products in many States, not just one, and that most individuals could travel readily between and among the States.

Cue *International Shoe*. It held that the Due Process Clause no longer required in-state personal service on defendants for a state court to exercise personal jurisdiction over them. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 319 (1945). After *International Shoe*, after the Court liberated the States from the requirement of having physical control over the parties in a lawsuit in its jurisdiction, every State enacted a long-arm statute that allowed claimants to file lawsuits against out-of-state defendants. *See* 1 Robert C. Casad, William M. Richman & Stanley E. Cox, Jurisdiction in Civil Actions § 4.01 (4th ed. 2014).

This change in law changed the policy calculus for tolling statutes of limitations, as the most salient justification for tolling the statute of limitations against out-of-state defendants no longer existed. Some state legislatures as a result amended their tolling statutes to apply only if their long-arm statute—usually construed to extend as far as the Due Process Clause permitted—could not reach the out-of-state defendant. *See, e.g.*, 735 Ill. Comp. Stat. 5/13-208; N.C. Gen. Stat. § 1-21; N.Y. C.P.L.R. § 207(3); Utah Code Ann. § 78B-2-104. Some state courts interpreted their tolling laws to have the same effect. *See, e.g.*, *Meyer*, 498 S.E.2d at 638–39; *Kuk v. Nalley*, 166 P.3d 47, 50–55 (Alaska 2007); *Walsh v. Ogorzalek*, 361 N.E.2d 1247, 1250 (Mass. 1977).

But several States, including Ohio, did not alter their tolling statutes, whether via amendment or interpretation. The tolling laws of Ohio thus work today the way they always have worked. *Seeley v. Expert, Inc.*, 269 N.E.2d 121, 128 (Ohio 1971) (refusing to interpret Ohio's tolling statute to apply to a defendant only when Ohio's long-arm statute could not reach him).

In the face of these moving and non-moving parts, one other consideration deserves mention: The meaning of the Commerce Clause of the United States Constitution has not stood still. In granting Congress power "[t]o regulate Commerce . . . among the several States," U.S.

Const., art. I, § 8, cl. 3, the Constitution implied that the States had no such power. *See* 2 The Records of the Federal Convention of 1787, at 625 (Max Farrand ed. 1966) (James Madison grew "more & more convinced" that the regulation of commerce among the States "was in its nature indivisible and ought to be wholly under one authority."). Hence the creation of a negative, implied, dormant limitation on the States' power to regulate interstate commerce. For much of American history, a challenge to a state or federal regulation thus required courts to police the boundary between Congress's exclusive sphere of regulation and the States' exclusive sphere. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 187–89, 197–200 (1824); *id.* at 226–27 (Johnson, J., concurring).

Not so today. Over time, the lines between the separate spheres blurred, "in part because the nature of commerce changed, in part because the Supreme Court's interpretation of the Commerce Clause changed." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 377 (6th Cir. 2013) (Sutton, J., concurring). Interstate commerce now embraces activities that were traditionally considered quintessentially local, such as growing wheat for home consumption, *Wickard v. Filburn*, 317 U.S. 111 (1942), and local loan sharking, *Perez v. United States*, 402 U.S. 146 (1971). Today, the National Government and the States exercise concurrent power over details large and small of everyday life. Separate spheres of power have given way to overlapping spheres of power, even to "cooperative federalism." *See New York v. United States*, 505 U.S. 144, 167 (1992).

All of this changed the nature of dormant Commerce Clause review. It was once essential to keep each governmental authority—the Federal Government and the States—in their separate spheres. In a world of largely overlapping authority over interstate commerce, that imperative no longer drives the analysis. Through it all, from the founding to today, Congress retains power to police and correct discrimination against multi-state commerce on its own by preempting state laws that interfere with interstate commerce.

B.

Courts generally reserve dormant Commerce Clause review for laws that protect in-state economic interests at the expense of out-of-state competitors. Unconstitutional "economic

protectionism," *McBurney v. Young*, 569 U.S. 221, 235 (2013), may come in many forms. State laws that discriminate explicitly against interstate commerce are almost always invalid—"virtually *per se*" invalid, it is said. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–39 (2007). So too of laws that appear neutral but have an impermissibly protectionist purpose or effect. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–71 (1984); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–52 (1977). But when a law fits neither of these descriptions, and has only an incidental effect on interstate commerce, laxer review applies. Such laws will be upheld unless they impose burdens on interstate commerce that clearly exceed their local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 144–46 (1970).

The Ohio law clears each of these hurdles. Dr. Menendez does not claim that the law explicitly discriminates against interstate commerce. For good reason. On its face, the tolling statute bears none of the hallmarks of facial discrimination. It draws no distinctions based on residency. The law applies to an Ohio resident who commits a tort in Ohio just as it applies to a Michigan resident who does the same. *Johnson v. Rhodes*, 733 N.E.2d 1132, 1133 (Ohio 2000); Ohio Rev. Code § 2305.15. And it does not distinguish between interstate transactions and intrastate transactions. The tolling statute applies regardless of where the underlying lawsuit arises. *See Seeley*, 269 N.E.2d at 123.

The law, it is true, by its nature will affect out-of-state residents more often than in-state ones. But that reality does not establish a cognizable form of discrimination if the statute otherwise treats similarly situated in-state and out-of-state entities the same. *General Motors Corp. v. Tracy*, 519 U.S. 278, 298–99 (1996); *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471–72 (1981) (rejecting a claim of discrimination because the challenged statute "regulate[d] evenhandedly . . . without regard to whether the [commerce came] from outside the State"). Ohio tolls the statute of limitations for a defendant outside of the State regardless of whether he once resided in Ohio or not.

What of the possibility that Ohio's tolling statute has a protectionist purpose or effect? *See Hunt*, 432 U.S. at 350–52. The history of the law, as shown, removes any possibility that

Ohio enacted it to favor in-state residents at the expense of out-of-state ones.  Ohio passed the law to address a quaint problem—that plaintiffs at one point in American legal history had no authority to pull out-of-state individuals or entities into the jurisdiction to defend a lawsuit.

Nor does the law's surface neutrality disguise a cognizable protectionist effect.  The Ohio tolling statute does not operate like an embargo on interstate commerce while leaving intrastate transactions unhindered.  The law at issue in *Hunt* offers a revealing contrast.  432 U.S. at 350–51.  The North Carolina law prohibited apple growers from fixing state-specific grading labels on apples sold in the State.  Because only Washington apple growers used such labels, the law acted as an "embargo" on Washington-grown apples without effecting the sales of North Carolina-grown apples.  *Id.* at 352.  This tolling law does not remotely have such an effect.

What of the possibility that the law violates the more deferential review established by *Pike* balancing?  Here is Dr. Menendez's theory.  The law violates *Pike*, he says, by starting the statute of limitations clock when an itinerant Ohioan commits a tort in Ohio and by stopping the clock when he leaves the State before the statute of limitations expires.  In this way, he explains, the law discourages Ohio residents from moving by adding a cost to relocating and by depriving other States of the commercial benefits that new residents might bring.  We don't see it.

Start with the stops.  Many state benefits stop when a resident leaves a State.  Texans do not pay a state income tax but lose that benefit when they move.  Floridians do not pay an estate tax but lose that benefit when they move.  Many States offer their residents—and their residents alone—an in-state tuition break for attendance at the State's universities.  Some States have higher minimum-wage laws than others.  Some States have lower licensing fees than others.  And some States charge higher licensing fees for out-of-state residents.  Just ask a fisherman.  *All* of these policy choices (and many more) provide benefits to residents that the residents put in jeopardy if they move.  In truth, States discourage residents from leaving whenever they provide residents with policies they like.  That indeed is the point of the benefits.  But the States' ability to attract and retain residents through policy choices has long been considered a healthy byproduct of the laboratories of democracy in our federalism-based system of government, not a sign of unconstitutional protectionism.  *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1141 (2016);

Michael W. McConnell, *Federalism: Evaluating the Founders' Design*, 54 U. Chi. L. Rev. 1487, 1503–04 (1987).

That is the central lesson we take from *McBurney v. Young*, 569 U.S. 221 (2013). It considered a Virginia law that provided Virginians with access to Virginia public records but did not provide out-of-state residents with the same. 569 U.S. at 224. One could say there, as one could say here, that the Virginia law discouraged Virginians from moving to other States because they would lose the ability to make public record requests by doing so. But the Court held that the law did not impose a cognizable burden on any interstate market that the dormant Commerce Clause protects. *Id.* at 235–36. In doing so, it explained that the "'common thread' among those cases in which the Court has found a dormant Commerce Clause violation is that 'the State interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation.'" *Id.* at 235 (citation omitted). And it said that the Virginia law "neither prohibits access to an interstate market nor imposes burdensome regulation on that market." *Id.* The case was therefore "not governed by the dormant Commerce Clause." *Id.* at 236.

Just so here. Ohioans faced with a medical malpractice lawsuit benefit from the one-year statute of limitations if they remain in the State. That does not fit within the "common thread" of the Court's dormant Commerce Clause cases.

Even if discouraging residents from relocating could be considered a potential cognizable burden on interstate commerce (a doubtful proposition), we have no way of assessing that burden. The case ended at the motion-to-dismiss stage, at Dr. Menendez's request, and thus neither he nor anyone else offered any proof on the point. Nor is it obvious what such evidence would show. Keep in mind that the statute of limitations period is short: just one year. In that setting, it's fair to wonder how many Ohio doctors, including Dr. Menendez, would alter (or have altered) their retirement plans based on any tolling of the statute of limitations. Dr. Menendez suggests, without proof, that this long-standing law has dissuaded many Ohio doctors from retiring to Florida. But the North to South traffic on Interstate 75, we suspect, provides a long proof to the contrary, and the invalidation of this tolling provision, we also suspect, would not hasten that traffic.

But our conjecture is no better than Dr. Menendez's conjecture. Each is no replacement for the kind of proof of real burdens, as opposed to "hypothetical" burdens, needed to support such a challenge. *Assoc. Indus. of Mo. v. Lohman*, 511 U.S. 641, 654 (1994). *Pike* balancing is already a difficult exercise, *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 354 (2008), often requiring courts to make subjective judgments not unlike "deciding whether three apples are better than six tangerines," *id.* at 360 (Scalia, J., concurring). Difficulty becomes unworkability when courts are forced to speculate about the extent of a hypothetical burden without concrete proof. For that reason, courts have held that the party challenging the law bears the responsibility of proving that the burdens placed on interstate commerce outweigh the law's benefits, *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 805 (6th Cir. 2005), and have turned away challengers who failed to meet that responsibility, *see Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 157–59 (4th Cir. 2016); *Baude v. Heath*, 538 F.3d 608, 612–13 (7th Cir. 2008); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995). Dr. Menendez has not offered any evidence about how much the tolling statute burdens interstate commerce, if in fact it burdens such commerce at all. Keep in mind that the Court has not invalidated a law under *Pike* balancing in three decades. We do not think that this tolling statute is a good candidate to break the streak.

Dr. Menendez separately argues that the Ohio law "encumbered" his right to "move freely" from Ohio to Florida. Appellee's Br. 14. But that is not a dormant Commerce Clause argument. It is an argument that Ohio burdened his "right to travel" under the Constitution. *See Saenz v. Roe*, 526 U.S. 489, 500–01 (1999). Any such right does not help him. *Saenz* held that a California law limiting the welfare benefits available to new residents imposed no direct barrier on the ability to travel. *Id.* Ohio's tolling statute imposes no greater barrier on the ability to travel than the welfare-limiting law in *Saenz*.

The Privileges and Immunities Clause does not advance the doctor's argument either. The Clause prohibits States from denying out-of-state residents "fundamental" rights provided to their own residents. *McBurney*, 569 U.S. at 227–28. A statute of limitations defense is not a fundamental right. *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945). For that reason, the Supreme Court has twice upheld a State's decision to provide its own residents with more

robust statute of limitations protections. *Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553, 563 (1920); *Chemung Canal Bank v. Lowery*, 93 U.S. 72, 78 (1876).

Even so, Dr. Menendez claims that two cases support his position: *Edwards v. California*, 314 U.S. 160 (1941), and *Bendix Autolite Corp. v. Midwesco Enterprises*, 486 U.S. 888 (1988). Neither one requires us to invalidate this law.

*Edwards* held that a California law banning the transportation of indigent people into the State violated the Commerce Clause. 314 U.S. at 177. But a complete ban on travel differs in degree and kind from the Ohio law. It does not ban any travel, and no evidence shows that it discourages relocation.

*Bendix* offers the most support for the doctor's position because it involves the same Ohio law—as applied to an out-of-state company. But it does not carry the water needed to invalidate this law. An Illinois company (Midwesco) agreed to install a boiler system for an Ohio company (Bendix) in one of its Ohio facilities. 486 U.S. at 889–90. Midwesco allegedly did a poor job and Bendix sued, relying on the Ohio statute to toll the limitations period because Midwesco was an out-of-state company. *Id.* The Court held that this application of the tolling statute violated the dormant Commerce Clause. By applying its tolling statute, the Court explained, Ohio forced out-of-state companies like Midwesco to face liability indefinitely as a cost of doing business across state lines. *Id.* at 891–93. The Court held that this favoritism imposed a "significant" burden on interstate commerce that, measured by *Pike* balancing, outweighed any local benefits of the law. *Id.*

But the tolling statute does not impose a cost on a traditional interstate business transaction in the same way in today's case. At the time of the medical/business transaction, Dr. Menendez lived in Ohio, and he treated Garber, an Ohio resident, in Ohio. That application of the statute does not lead to favoritism toward in-state firms over out-of-state ones. It merely creates a benefit for residents of Ohio. As with the public records benefit provided to Virginia residents—and only Virginia residents—it does not "prohibit[] access to an interstate market" or "impose[] burdensome regulation on that market." *McBurney*, 569 U.S. at 235. To reach a contrary decision, we would have to travel down the path of saying that all state policy benefits

reserved for residents need to satisfy *Pike* balancing because all in-state benefits potentially affect commerce by potentially affecting where people choose to live. That is a bridge too far. Policy incentives that entice residents to stay in a State do not impose a cognizable burden on any interstate market under the dormant Commerce Clause, as *McBurney* illustrates and as common sense intimates.

Dr. Menendez adds one last point—that the tolling statute should be invalidated because it serves no useful purpose. Ohio has a valid long-arm statute, and he remains amenable to service under it. Ohio Rev. Code § 2307.382. *International Shoe*, he argues, thus has eclipsed any valid purpose once served by the law. But just because due process no longer stands as a barrier to hailing an out-of-state defendant to court does not mean that practical challenges no longer exist. When an in-state defendant moves out of the State, as the facts of this case illustrate, the defendant "remains potentially difficult to locate" and "may not be so easy to find and serve." *G. D. Searle & Co. v. Cohn*, 455 U.S. 404, 410 (1982). The statute still benefits Ohio plaintiffs who wish to sue Ohio defendants who have left the State. That is enough of a local benefit to survive *Pike* review on this record.

For these reasons, we reverse and remand the case for further proceedings.