**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as**
*Kennedy v. W. Res. Senior Care***, Slip Opinion No. 2024-Ohio-5565.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5565

KENNEDY, EXR. OF THE ESTATE OF GERRES, APPELLANT, *v.* WESTERN RESERVE SENIOR CARE ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Kennedy v. W. Res. Senior Care*, Slip Opinion No. 2024-Ohio-5565.]**

*Medical malpractice—Out-of-state defendant—R.C. 2305.15(A)—Dormant Commerce Clause of United States Constitution—R.C. 2305.15(A) does not violate dormant Commerce Clause as applied to a physician who moved out of Ohio to practice medicine in another state—Judgment reversed and cause remanded to trial court.*

(No. 2023-0372—Submitted July 9, 2024—Decided November 27, 2024.)

APPEAL from the Court of Appeals for Portage County,

No. 2021-P-0055, 2023-Ohio-264.

_____

STEWART, J., authored the opinion of the court, which FISCHER, DEWINE, BRUNNER, and DETERS, JJ., joined. KENNEDY, C.J., concurred in judgment only.

DONNELLY, J., dissented and would dismiss the appeal as having been improvidently accepted.

**STEWART, J.**

{¶ 1} R.C. 2305.15, commonly referred to as "the tolling statute," states that if a person who is subject to a lawsuit leaves the State, the statutory periods for commencing that lawsuit do not begin to run—that is, those statutory periods are tolled—while the person remains out of the State. *See* R.C. 2305.15(A).[1] In this case, we are asked to determine whether the tolling statute violates the Commerce Clause of the United States Constitution. *See* U.S. Const., art. I, § 8, cl. 3. For the reasons that follow, we hold that it does not. We therefore reverse the judgment of the Eleventh District Court of Appeals and remand this matter to the trial court for further proceedings.

## BACKGROUND

{¶ 2} This case concerns a wrongful-death claim involving allegations of medical malpractice. In September 2014, appellant, Claudia Kennedy, executor of the estate of Donald R. Gerres, filed a medical-malpractice action against appellees, Western Reserve Senior Care, Dr. Sataya Acharya, and others (collectively, "the healthcare providers"), on behalf of Gerres's estate. *See Kennedy v. Robinson Mem. Hosp.*, Portage C.P. No. 2014 CV 00764 (Sept. 23, 2014). Kennedy asserted that the healthcare providers' substandard medical care wrongfully caused Gerres's death in October 2013. *Id.* Kennedy voluntarily dismissed the action without prejudice in January 2019, *see Kennedy*, Portage C.P. No. 2014 CV 00764 (Jan. 28, 2019), and refiled suit within one year. The healthcare providers moved for

---

1. R.C. 2305.15 was amended by the General Assembly while this action was pending. *See* 2024 Am.H.B. No. 179 (effective Oct. 24, 2024). This opinion analyzes the constitutionality of the tolling statute as it existed before the 2024 amendments took effect. *See* Am.Sub.S.B. No. 281, 149 Ohio Laws, Part II, 3791, 3804. All references to R.C. 2305.15 in this opinion refer to the pre-amendment version of the statute.

judgment on the pleadings in the refiled action, arguing that the four-year statute of repose for medical claims barred Kennedy's refiled action from proceeding. Kennedy opposed the motion, arguing, among other things, that Ohio's saving statute, R.C. 2305.19, saved the refiled action from expiring under the four-year statute of repose for medical claims because she had originally commenced the action within four years of Gerres's death—in other words, she had filed the original medical-malpractice action within the four-year repose period. The trial court denied the motion, finding that the saving statute applied to preserve the refiled action.

{¶ 3} Just over a year after the trial court denied the healthcare providers' motion for judgment on the pleadings, this court issued its decision in *Wilson v. Durrani*, 2020-Ohio-6827. In *Wilson*, this court reached the opposite conclusion of the trial court in this case, holding that the saving statute does not operate to preserve claims that were filed within the four-year repose period when those claims were voluntarily dismissed and then refiled after the statute of repose's four-year timing limitation has expired. *Id*. at ¶ 18-38.

{¶ 4} Following this court's decision in *Wilson*, the healthcare providers in this case sought leave from the trial court to move for summary judgment, again pointing to the statute of repose as a bar to Kennedy's refiled action. The trial court denied the healthcare providers' motion on the basis that the case had been pending for almost three years and was scheduled for a jury trial in less than a month. The healthcare providers filed a motion for a directed verdict on the last business day before the trial began, again arguing that this court's decision in *Wilson* controlled and therefore Kennedy's refiled medical-malpractice action was barred by the statute of repose and not saved by the saving statute. Following Kennedy's opening statements, the trial court granted the healthcare providers' motion for a directed verdict.

{¶ 5} Kennedy appealed the trial court's judgment to the Eleventh District. 2023-Ohio-264 (11th Dist.). On appeal, Kennedy argued that regardless of whether the saving statute applied to preserve her refiled medical-malpractice action, another statute, R.C. 2305.15(A), preserved her action against Dr. Acharya. The version of R.C. 2305.15(A) that was in effect when Kennedy commenced her original medical-malpractice action in 2014 and her refiled action in 2019 and when the Eleventh District issued its judgment in this matter stated:

> When a cause of action accrues against a person, *if the person is out of the state*, has absconded, or conceals self, the period of limitation for the commencement of the action as provided in sections 2305.04 to 2305.14, 1302.98, and 1304.35 of the Revised Code does not begin to run until the person comes into the state or while the person is so absconded or concealed. After the cause of action accrues if the person departs from the state, absconds, or conceals self, the time of the person's absence or concealment shall not be computed as any part of a period within which the action must be brought.

(Emphasis added.) Am.Sub.S.B. No. 281, 149 Ohio Laws, Part II, 3791, 3804. Kennedy argued that R.C. 2305.15(A) tolled the four-year statute of repose for her claim against Dr. Acharya because Dr. Acharya had moved to Pennsylvania after Gerres's death and had continued to live outside Ohio when both the original medical-malpractice action and the refiled action were brought and that Dr. Acharya remained outside Ohio while the refiled action was pending before the trial court.

{¶ 6} While Kennedy's direct appeal was pending before the Eleventh District, this court issued its decision in *Elliot v. Durani*, 2022-Ohio 4190. In *Elliot*, we held that R.C. 2305.15(A) tolls the running of the four-year medical-malpractice

statute of repose set forth in R.C. 2305.113(C) when a defendant has fled the country. *Elliot* at ¶ 1. The Eleventh District recognized our decision in *Elliot* as relevant to the present case. *See* 2023-Ohio-264 at ¶ 35-38 (11th Dist.). Nevertheless, the court of appeals affirmed the trial court's dismissal of Kennedy's refiled action on the theory that application of the tolling statute to the medical-malpractice action against Dr. Acharya, whom it determined had left the State for legitimate business purposes to seek employment in Pennsylvania, violates the dormant Commerce Clause by interfering with the right of Congress to regulate commerce. *Id.* at ¶ 39. In reaching that conclusion, the court of appeals primarily relied on *Bendix Autolite Corp. v. Midwesco Ents., Inc.*, 486 U.S. 888 (1988), in which the United States Supreme Court examined Ohio's tolling statute[2] and struck down the statute as unconstitutional as applied to an out-of-state corporation doing business in Ohio on the ground that it impermissibly burdened interstate commerce. *See* 2023-Ohio-264 at ¶ 39 (11th Dist.).

{¶ 7} Kennedy appealed to this court. We accepted jurisdiction over Kennedy's third proposition of law, which states: "Regardless of whether a defendant leaves the state for 'legitimate business purposes,' the medical malpractice statute of repose is tolled pursuant to R.C. 2305.15(A)." *See* 2023-Ohio-1830; 2023-Ohio-4773.

## ANALYSIS

{¶ 8} Kennedy challenges the Eleventh District's determination that R.C. 2305.15(A) is unconstitutional under the dormant Commerce Clause. "Whether a statute is constitutional is a question of law that we review de novo." *Portage Cty. Educators Assn. for Dev. Disabilities-Unit B, OEA/NEA v. State Emp. Relations Bd.*, 2022-Ohio-3167, ¶ 7. "[A]ll statutes are presumed [to be]

---

2. The version of the tolling statute reviewed by the United States Supreme Court in *Bendix* was substantively the same as the version of R.C. 2305.15(A) that we analyze here. *Compare* Am.S.B. No. 5, 129 Ohio Laws 13, 177, *with* Am.Sub.S.B. No. 281, 149 Ohio Laws, Part II, at 3804.

constitutional, and the party challenging a statute bears the burden of proving otherwise." *State v. Boczar*, 2007-Ohio-1251, ¶ 9.

{¶ 9} The United States Constitution provides that Congress shall have the power "[t]o regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. While the language of the Commerce Clause speaks directly to Congress's power to regulate commerce, the clause has been interpreted to contain an implicit limitation on state governments' ability to take actions that would impair interstate commerce. *See DIRECTV, Inc. v. Levin*, 2010-Ohio-6279, ¶ 17. This implicit limitation on state power is known as the dormant Commerce Clause. *See id*. We have previously described the history and purpose of the dormant Commerce Clause as follows:

The doctrine of the dormant Commerce Clause traces its roots to "[t]he desire of the Forefathers to federalize regulation of foreign and interstate commerce." *H.P. Hood & Sons, Inc. v. Du Mond* (1949), 336 U.S. 525, 533, 69 S.Ct. 657, 93 L.Ed. 865. As the court explained in *Camps Newfound/Owatonna, Inc. v. Harrison* (1997), 520 U.S. 564, 571, 117 S.Ct. 1590, 137 L.Ed.2d 852, "[d]uring the first years of our history as an independent confederation, the National Government lacked the power to regulate commerce among the States. Because each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, what Justice Johnson characterized as a 'conflict of commercial regulations, destructive to the harmony of the States,' ensued." *Id*., quoting *Gibbons v. Ogden* (1824), 22 U.S. (9 Wheat.) 1, 224, 6 L.Ed. 23 (Johnson, J., concurring).

Accordingly, the modern cases arising under what has become known as the dormant Commerce Clause are "driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *Kentucky Dept. of Revenue* [*v. Davis*], 553 U.S. [328,] 337-338, 128 S.Ct. 1801, 170 L.Ed.2d 685 [(2008)], quoting *New Energy Co. of Indiana v. Limbach* (1988), 486 U.S. 269, 273-274, 108 S.Ct. 1803, 100 L.Ed.2d 302. The dormant Commerce Clause thus enshrines the economic policy of the framers to prohibit states from erecting barriers to free trade across state borders and from enacting laws that favor local enterprises at the expense of out-of-state businesses. *Boston Stock Exchange v. New York State Tax Comm.* (1977), 429 U.S. 318, 328-329, 97 S.Ct. 599, 50 L.Ed.2d 514.

(First set of brackets in original.) *DIRECTV, Inc.*, at ¶ 18-19.

{¶ 10} The dormant Commerce Clause prohibits state laws that protect in-state economic interests at the expense of out-of-state competitors. *See Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992). The United States Supreme Court previously announced a two-tiered approach for analyzing dormant Commerce Clause challenges. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578-579 (1986). The first tier requires reviewing courts to inquire whether the law "directly regulates or discriminates against interstate commerce, or [if its] effect is to favor in-state economic interests over out-of-state interests." *Id*. at 579. If under this first tier the law is found to be discriminatory[3]

---

3. In this context, "discrimination" is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Oregon Dept. of Environmental Quality*, 511 U.S. 93, 99 (1994).

on its face or in its purpose or effect, the law will be deemed "virtually *per se* invalid," *Oregon Waste Sys., Inc. v. Oregon Dept. of Environmental Quality*, 511 U.S. 93, 99 (1994), unless the State can meet the requirements of strict scrutiny by showing that the law "'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives,' " *id*. at 101, quoting *New Energy Co.* at 278. If, however, "a statute has only indirect effects on interstate commerce and regulates evenhandedly," the reviewing court must proceed to the second tier of the analysis and apply a balancing test to determine whether the law nevertheless violates the dormant Commerce Clause by impermissibly burdening interstate commerce. *Brown-Forman* at 579. Under this balancing test, known as the *Pike* balancing test, a law "will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

{¶ 11} Although this two-tiered approach provides a basic framework for reviewing state laws and regulations under the dormant Commerce Clause, the Supreme Court has struggled with defining a clear set of rules that can be applied consistently in these cases. Indeed, the two-tiered approach has been criticized on the ground that the "effects" prong of the first tier will eventually overlap with the second tier, resulting in a lack of clarity about whether strict scrutiny or the more permissive balancing test should apply to the analysis. *See, e.g.*, *Brown-Forman* at 579, ("[T]here is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity."), citing *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440-441 (1978); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298, fn. 12 (1997) (noting there is no clear line between the first tier and second tier of the *Pike* balancing test); *Camps Newfound/Owatonna* at 596 (Scalia, J., dissenting) ("Our [dormant

8

Commerce Clause] cases have struggled (to put it nicely) to develop a set of rules by which we may preserve a national market without needlessly intruding upon the States' police powers, each exercise of which no doubt has some effect on the commerce of the Nation."); *Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 706 (Rehnquist, J., dissenting) ("the jurisprudence of the [dormant] Commerce Clause remains hopelessly confused").

{¶ 12} Recently however, in *Natl. Pork Producers Council v. Ross*, 598 U.S. 356 (2023), the United States Supreme Court clarified the application of the dormant Commerce Clause by synthesizing decades of its jurisprudence into a few key takeaways. Central among these is that economic "antidiscrimination . . . lies at the 'very core' of [the Court's] dormant Commerce Clause Jurisprudence," *id.* at 369. Another key takeaway is that a state law will not be deemed invalid under the first tier of review (the tier applying strict scrutiny) just because the law may have practical effects on interstate commerce. *See id.* Rather, for strict scrutiny to apply, there must be a showing that the law in question *purposefully* discriminates against out-of-state interests as a means of benefitting in-state interests. *Id*. at 378.

{¶ 13} The Court also explained in *Ross* that the two tiers of the dormant Commerce Clause analysis may seem to overlap because the *Pike* balancing test has, for the most part, been used by the Court as a means of sussing out whether a law has a discriminatory purpose when it may otherwise appear to be neutral. *Ross* at 377-379. Specifically, the Court stated:

> While many of our dormant Commerce Clause cases have asked whether a law exhibits "'facial discrimination,'" "several cases that have purported to apply [*Pike*,] including *Pike* itself," have "turned in whole or in part on the discriminatory character of the challenged state regulations." [*Gen. Motors Corp.*, 519 U.S. at 298, n. 12]. In other words, if some of our cases focus on whether a state law

discriminates on its face, the *Pike* line serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose.

*Pike* itself illustrates the point. That case concerned an Arizona order requiring cantaloupes grown in state to be processed and packed in state. 397 U.S., at 138-140. The Court held that Arizona's order violated the dormant Commerce Clause. *Id.*, at 146. Even if that order could be fairly characterized as facially neutral, the Court stressed that it "requir[ed] business operations to be performed in [state] that could more efficiently be performed elsewhere." *Id*., at 145. The "practical effect[s]" of the order in operation thus revealed a discriminatory purpose—an effort to insulate in-state processing and packaging businesses from out-of-state competition. *Id.*, at 140, 145.

Other cases in the *Pike* line underscore the same message. In *Minnesota v. Clover Leaf Creamery Co.*, [a case involving a Minnesota law prohibiting the retail sale of milk and milk products in nonrefillable, nonreturnable plastic containers,] the Court found no impermissible burden on interstate commerce because, looking to the law's effects, "there [was] no reason to suspect that the gainers" would be in-state firms or that "the losers [would be] out-of-state firms." 449 U.S. 456, 473 (1981); see also *id*., at 474-477, and n. 2, (Powell, J., concurring in part and dissenting in part) (asking whether the "actual purpose," if not the "'avowed purpose,' " of the law was discrimination). Similarly, in *Exxon Corp. v. Governor of Maryland*, [a case involving a Maryland law that prohibited oil producers or refiners from operating gasoline stations within the state and required producers and refiners to extend

temporary price cuts to all the stations they supplied,] the Court keyed to the fact that the effect of the challenged law was only to shift business from one set of out-of-state suppliers to another.  437 U.S. 117, 127 (1978).  And in *United Haulers* [*Assn., Inc. v. Oneida-Herkimer Solid Waste Mgt. Auth.*], a plurality upheld the challenged law[, a local flow-control ordinance requiring locally produced garbage to be delivered to local, publicly owned facilities,] because it could not "detect" any discrimination in favor of in-state businesses or against out-of-state competitors.  550 U.S. [330,] 346 [(2007)].  In each of these cases and many more, the presence or absence of discrimination in practice proved decisive.

Once again, we say nothing new here.  Some time ago, [*Gen. Motors Corp.*] identified the congruity between our core dormant Commerce Clause precedents and the *Pike* line.  519 U.S., at 298, n. 12.  Many lower courts have done the same.  See, *e.g.*, *Rosenblatt v. Santa Monica*, 940 F.3d 439, 452 (CA9 2019); *Park Pet Shop, Inc. v. Chicago*, 872 F.3d 495, 501 (CA7 2017); *Amanda Acquisition Corp. v. Universal Foods Corp*., 877 F.2d 496, 505 (CA7 1989).  So have many scholars.  See, *e.g.*, R. Fallon, The Dynamic Constitution 311 (2d ed. 2013) (observing that *Pike* serves to "'smoke out' a hidden" protectionism); B. Friedman & D. Deacon, A Course Unbroken: The Constitutional Legitimacy of the Dormant Commerce Clause, 97 Va.L.Rev. 1877, 1927 (2011); Regan, [The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,] 84 Mich.L.Rev. [1091,] 1286 [(1986)].

(First, third through fifth, and seventh and eighth sets of brackets in original). *Ross* at 377-379.

{¶ 14} Lastly, the Court emphasized in *Ross* that ""'extreme caution' " is warranted," *id.* at 390, quoting *Gen. Motors Corp.* at 310, quoting *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 302 (1944) (Black, J., concurring), when reviewing dormant Commerce Clause claims because "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear,' " *id.*, quoting *Conway* v. *Taylor's Executor*, 66 U.S. 603, 634 (1862). Considering the principles outlined above, we find that applying R.C. 2305.15(A) to this case based on Dr. Acharya's absence from the State does not result in a clear infraction of the dormant Commerce Clause.

**Tier I Review: R.C. 2305.15(A) Does Not Have a Discriminatory Purpose**

{¶ 15} This court has already determined that R.C. 2305.15(A) does not evince a discriminatory intent on its face. *See Johnson v. Rhodes*, 2000-Ohio-235. In *Johnson*, we held that R.C. 2305.15(A) does not violate the dormant Commerce Clause when applied to those persons who "temporarily leave[] the state of Ohio for non-business reasons." *Johnson* at ¶ 12. In other words, we determined that as applied to the individual facts of that case, R.C. 2305.15(A) is not unconstitutional. It is important to note that we could not have reached the conclusion that we did in *Johnson* had we not first determined that the statutory language was neutral and nondiscriminatory on its face. *See Oregon Waste Sys.*, 511 U.S. at 99 (statutes that place restrictions on interstate commerce and are facially discriminatory are "virtually *per se* invalid"). Accordingly, we find that R.C. 2305.15(A) is not facially discriminatory. We also find that neither the history nor the practical effects of the law evince an economically protectionist purpose.

{¶ 16} In *Garber v. Menendez*, the United States Court of Appeals for the Sixth Circuit encountered the same question we now face: whether R.C.

2305.15(A) violates the dormant Commerce Clause as applied to a physician who moved out of Ohio. 888 F.3d 839, 840 (6th Cir. 2018). In upholding the constitutionality of R.C. 2305.15(A), the Sixth Circuit traced the origin of the tolling statute back to the early nineteenth century and the complications arising from an era when a state court's personal jurisdiction over a defendant was dictated by the defendant's physical presence within the State and nothing more. The Sixth Circuit explained:

> For the first century and a half of American history, the States could not authorize their courts to impose liabilities upon people over whom they had no control. The "foundation of jurisdiction" being "physical power," *McDonald v. Mabee*, 243 U.S. 90, 91, 37 S.Ct. 343, 61 L.Ed. 608 (1917), a State could not exercise personal jurisdiction over a defendant unless the plaintiff served the defendant with process within the State, where it could exercise physical control over him. *See Burnham v. Superior Court of Cal.*, 495 U.S. 604, 616, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990).
>
> *Pennoyer v. Neff* converted this common law rule into a constitutional command. It construed the Due Process Clause [of the Fourteenth Amendment to the United States Constitution] to mean that one State could not compel a party residing in another State to respond to a lawsuit. 95 U.S. 714, 733, 24 L.Ed. 565 (1877).
>
> The common law rule and *Pennoyer* created a practical problem. Defendants might commit wrongs against a State's residents and avoid liability by leaving the State and waiting for the statute of limitations to expire. *Meyer v. Paschal*, 330 S.C. 175, 498 S.E.2d 635, 637 (1998). Once a statute of limitations started, it usually did not stop. Many States responded to the problem by

13

enacting laws that tolled the limitations period for out-of-state defendants, whether they fled the jurisdiction in the face of a lawsuit or left innocently for greener pastures. 2 H.G. Wood, A Treatise on the Limitation of Actions at Law and in Equity § 244, at 1143-47 (Dewitt C. Moore, ed., 4th ed. 1916) (collecting statutes).

Ohio joined this crowd early. Seven years after Ohio became a State in 1803, its legislature enacted a law that tolled the statute of limitations "when any person or persons against whom there is [a] cause of action[] shall have left the state." An Act for the Limitation of Actions, ch. 213, § 2 (1810), *reprinted in* 1 The Statutes of Ohio and of the Northwestern Territory 656 (Salmon P. Chase, ed., 1833).

The premises of these policies and constitutional rulings shifted over time. By the early Twentieth Century, new modes of transportation and communication meant that many businesses sold their products in many States, not just one, and that most individuals could travel readily between and among the States.

Cue *International Shoe*. It held that the Due Process Clause no longer required in-state personal service on defendants for a state court to exercise personal jurisdiction over them. *Intl. Shoe Co. v. Washington,* 326 U.S. 310, 316, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). After *International Shoe*, after the Court liberated the States from the requirement of having physical control over the parties in a lawsuit in its jurisdiction, every State enacted a long-arm statute that allowed claimants to file lawsuits against out-of-state defendants. *See* 1 Robert C. Casad, William M. Richman & Stanley E. Cox, Jurisdiction in Civil Actions § 4.01 (4th ed. 2014).

This change in law changed the policy calculus for tolling statutes of limitations, as the most salient justification for tolling the

14

statute of limitations against out-of-state defendants no longer existed. Some state legislatures as a result amended their tolling statutes to apply only if their long-arm statute—usually construed to extend as far as the Due Process Clause permitted—could not reach the out-of-state defendant. *See, e.g.*, 735 Ill.Comp.Stat. 5/13-208; N.C.Gen.Stat. § 1-21; N.Y.C.P.L.R. § 207(3); Utah Code Ann. § 78B-2-104. Some state courts interpreted their tolling laws to have the same effect. *See, e.g.*, *Meyer*, 498 S.E.2d at 638-639; *Kuk v. Nalley*, 166 P.3d 47, 50-55 (Alaska 2007); *Walsh v. Ogorzalek*, 372 Mass. 271, 361 N.E.2d 1247, 1250 (1977).

But several States, including Ohio, did not alter their tolling statutes, whether via amendment or interpretation. The tolling laws of Ohio thus work today the way they always have worked. *Seeley v. Expert, Inc.*, 26 Ohio St.2d 61, 269 N.E.2d 121, 128 (Ohio 1971) (refusing to interpret Ohio's tolling statute to apply to a defendant only when Ohio's long-arm statute could not reach him).

*Garber* at 841-842.

{¶ 17} We agree with the Sixth Circuit's summary in *Garber* of the history of Ohio's tolling statute and find as that court did: that the underpinnings of R.C. 2305.15(A) are wholly innocuous. Nothing in the history of the tolling statute suggests that its enactment was motivated by a desire to undertake state economic protectionism; rather, "Ohio passed the law to address a quaint problem—that plaintiffs at one point in American legal history had no authority to pull out-of-state individuals or entities into the jurisdiction to defend a lawsuit," *Garber* at 843.

{¶ 18} We also find that the practical effects of the facially neutral law are not so onerous on interstate commerce that they disclose some hidden economic protectionism. *See Ross*, 598 U.S. at 377 ("a law's practical effects may also

disclose the presence of a discriminatory purpose"). The primary practical effect of R.C. 2305.15(A) is to toll the statutory periods for commencing a lawsuit while a defendant is not present in the State.[4] Although the tolling statute may no longer be as necessary as it was a century ago since personal jurisdiction is no longer tied to a defendant's physical presence within the State, the law nevertheless serves a legitimate local purpose: It stops the running of the statutory periods for commencing a lawsuit when a defendant is out of the State and potentially difficult to locate. *See Garber* at 846. The tolling statute applies with equal force to both residents and nonresidents of Ohio. *See Johnson*, 2000-Ohio-235. And nothing about R.C. 2305.15(A) directly regulates or touches on trade or business or any of the instrumentalities thereof—i.e., things traditionally associated with commerce. Thus, if R.C. 2305.15(A) can be said to have any practical effects on interstate commerce, those effects are incidental in nature, and are, at any rate, entirely dependent on the factual circumstances of each case.

### Tier II Review: R.C. 2305.15(A) Does Not Unduly Burden Interstate Commerce

{¶ 19} Although the dormant Commerce Clause is generally "concern[ed] with preventing purposeful discrimination against out-of-state economic interests," *Ross* at 371, the United States Supreme Court nevertheless acknowledged that it has "left the courtroom door open to challenges premised on even nondiscriminatory burdens" and that "a small number of [its] cases have invalidated state laws . . . that appear to have been genuinely nondiscriminatory" (cleaned up), *id.* at 379. Our task here under the second tier of review is to determine whether the present challenge to R.C. 2305.15(A) presents one of those rare instances in

---

4. R.C. 2305.15 as amended effective October 24, 2024, provides that the tolling provision set forth in division (A)(1)—the language of which is substantially similar to the language in the version of R.C. 2305.15(A) that we analyze here—does not apply to statutes of repose, including those contained in R.C. 2305.113(C) or (D) pertaining to medical claims. *See* 2024 Am.H.B. No. 179.

which a genuinely nondiscriminatory law should be struck down as unconstitutional because it is overly burdensome to interstate commerce. In making this determination, we are aided by the *Pike* balancing test, which instructs that a nondiscriminatory law must be upheld "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits," *Pike*, 397 U.S. at 142. We find that the balancing test weighs in favor of upholding the constitutionality of R.C. 2305.15(A).

{¶ 20} The putative local benefit of R.C. 2305.15(A) is to toll the running of the time for filing a lawsuit while a defendant remains out of the State, because an out-of-state defendant is potentially more difficult to locate and serve with a lawsuit. *See Garber*, 888 F.3d at 846-847. Here, Dr. Acharya takes the position that R.C. 2305.15(A) is unconstitutional because it discourages people like her from leaving the State for legitimate business purposes because of the threat of "perpetual liability" if the statutory period for commencing any potential lawsuit against them were to toll. Ultimately, this is the position that the Eleventh District adopted. In reaching its decision, the court of appeals relied on *Bendix*. The United States Supreme Court in *Bendix* held that applying Ohio's tolling statute to an out-of-state corporation violates the dormant Commerce Clause because the corporation would be forced "to choose between exposure to the general jurisdiction of Ohio courts or forfeiture of the limitations defense, remaining subject to suit in Ohio in perpetuity." *Bendix*, 486 U.S. at 893. The Court held that facing general jurisdiction for "all transactions, including those in which it did not have the minimum contacts necessary for supporting personal jurisdiction is a significant burden" that the tolling statute imposed only on out-of-state corporations. *Id*. According to the Court, that burden far outweighed the statute's local benefit of "protecting its residents from corporations who become liable for acts done within the State but later withdraw from the jurisdiction," because Ohio's long-arm statute provides a similar local benefit in most instances. *Id*. at 894.

{¶ 21} The Eleventh District determined that the United State Supreme Court's holding in *Bendix* controls the outcome of this case. *See* 2023-Ohio-264 at ¶ 39 (11th Dist.). In doing so, it noted its prior agreement with a federal district court's understanding of the law as being one by which "'interstate commerce is clearly affected when persons move between states in the course of or in search of employment,' " *id.*, quoting *Lovejoy v. Macek*, 122 Ohio App.3d 558, 562 (11th Dist. 1997), citing *Tesar v. Hallas*, 738 F.Supp. 240, 242 (N.D.Ohio 1990). Having determined that "there [was] no dispute that Dr. Acharya [had] moved from Ohio for legitimate business purposes," *id.*, the court of appeals held that "the tolling statute [could not] be constitutionally applied to her," *id.*

{¶ 22} In light of the United States Supreme Court's decision in *Ross*,[5] we disagree with the Eleventh District's analysis that R.C. 2305.15(A) is unconstitutional as applied to Dr. Acharya on the grounds that commerce is *affected* when people move from one state to another. As noted above, the Supreme Court's decision in *Ross* made clear that just because a state law may have practical effects on interstate commerce does not mean that the law will be struck down as unconstitutional under the dormant Commerce Clause. *See Ross*, 598 U.S. at 377-379 (explaining that to be struck down as unconstitutional, the state law must be shown to have a discriminatory effect or to impose such a substantial burden on interstate commerce that it overcomes the *Pike* balancing test). Furthermore, despite the Supreme Court's holding in *Bendix*, we are not convinced that the burden imposed by R.C. 2305.15(A) on Dr. Acharya is clearly excessive in relation to the statute's putative local benefit.

{¶ 23} To begin with, there is a stark contrast between the facts presented in this case and those in *Bendix*. In *Bendix*, the defendant corporation was an out-of-state entity that did some business in Ohio. *Bendix*, 486 U.S. at 889. To be

---

5. The Supreme Court issued its decision in *Ross* less than four months after the Eleventh District issued its decision in this case.

18

considered present within the State for purposes of Ohio's tolling statute, the corporation would have had to have hired a statutory agent for service of process in Ohio and by doing so, would have succumbed to the general jurisdiction of Ohio for all lawsuits—regardless of whether the lawsuit originated in Ohio. *Id*. at 892-894. The Supreme Court found that this burden on interstate commerce outweighed the local benefit of R.C. 2305.15(A) as applied to the corporation. *Id*. at 894. This makes sense. To have held otherwise would have meant that any corporation doing business in Ohio would have to hire a statutory agent for service of process in Ohio and submit to the general jurisdiction of Ohio courts because that corporation now has a physical presence in Ohio. Under such circumstances, Ohio courts might have become an epicenter of all business and tort litigation in the country just because of its tolling statute. This certainly would have had a significant impact on interstate commerce.

{¶ 24} But it is important to note here that unlike the defendant corporation in *Bendix*, Dr. Acharya is not a corporation, a business, or any other kind of entity that is in the business of regularly trading goods or services across state lines for profit. Dr. Acharya is a physician. As a physician, her relationship to commerce is attenuated, at best. As a physician, Dr. Acharya is also subject to state-medical-board licensing in whichever state she chooses to practice, and state medical-licensing laws have been upheld as valid health-and-safety regulations imposed at the state level. *See Hillsborough Cty., Fla. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 717 (1985). It appears to us that factors such as where a physician is licensed to practice medicine, the particular field of medicine a physician specializes in, and the locations of training programs and availability of attending positions to which a physician may be accepted are likely just as impactful if not more impactful determinants of whether a physician will cross state lines to practice medicine or will be limited in his or her movement than Ohio's tolling statute. Indeed, the same could be said for the impact of other state laws like state income-

tax laws and property-tax laws. Each of these factors may, individually or together, persuade a physician not to relocate to another State. Although we understand that the effect of R.C. 2305.15(A) on a physician's movement for legitimate business purposes must be evaluated in its own right—an analysis we endeavor to engage in despite limited evidence in the record—we mention these other factors because they help frame the conversation around whether and to what extent R.C. 2305.15(A) impacts a physician's decision to remain in Ohio or to leave the State and practice medicine elsewhere and whether this impact is, in the grand scheme of things, substantial enough to survive the *Pike* balancing test.

{¶ 25} Of course, we do not disagree with Dr. Acharya's counsel's averments at oral argument that there may be times when a physician may regularly cross state lines for legitimate business purposes, such as when a renowned surgeon in a specialized field travels to perform a complicated procedure. It is hypothetically possible that in such circumstances, Ohio's tolling statute may dissuade some physicians from traveling into or out of Ohio for fear of being exposed to continuing legal liability. But we are not persuaded that this is so common an occurrence that "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits," *Pike*, 397 U.S. at 142. At least, we see no such evidence in this record, and it is Dr. Acharya who has the burden of proving R.C. 2305.15(A) unconstitutional by means of actual evidence, not just hypotheticals, *see Boczar*, 2007-Ohio-1251, at ¶ 9. As the United States Court of Appeals for the Seventh Circuit explained,

> [a]ny balancing approach, of which *Pike* is an example, requires evidence. It is impossible to tell whether a burden on interstate commerce is "clearly excessive in relation to the putative local benefits" without understanding the magnitude of both burdens and benefits. Exact figures are not essential (no more than estimates

may be possible) and the evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under *Pike*.

(Citations omitted.) *Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008). On the record we have before us, we find that R.C. 2305.15(A) does not impose a burden on interstate commerce that is clearly excessive in relation to its putative local benefits.

## CONCLUSION

{¶ 26} We hold that Ohio's tolling statute, specifically R.C. 2305.15(A), does not violate the dormant Commerce Clause of the United States Constitution as applied to a physician who left Ohio to practice medicine in another state. We therefore reverse the judgment of the Eleventh District Court of Appeals and remand this matter to the trial court for further proceedings.

Judgment reversed
and cause remanded to the trial court.

_____

Plevin & Gallucci Co., L.P.A., Michael D. Shroge, and Frank L. Gallucci III; and Flowers & Grube, Paul W. Flowers, and Kendra N. Davitt, for appellant.

Buckingham, Doolittle & Burroughs, L.L.C, Dirk E. Riemenschneider, and Justin S. Greenfelder, for appellees.

Dave Yost, Attorney General, T. Elliot Gaiser, Solicitor General, and Michael J. Hendershot, Chief Deputy Solicitor General, urging reversal for amicus curiae, Ohio Attorney General Dave Yost.

_____