In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 07-3323 & 07-3338

PATRICK L. BAUDE, *et al.*,

*Plaintiffs-Appellees*,

*v.*

DAVID L. HEATH, Chairman of the Indiana
Alcohol and Tobacco Commission,

*Defendant-Appellant*,

*and*

WINE AND SPIRITS WHOLESALERS OF INDIANA,

*Intervening Defendant-Appellant*.

_____

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:05-CV-0735-JDT-TAB—**John Daniel Tinder**, *Judge*.

_____

ARGUED FEBRUARY 22, 2008—DECIDED AUGUST 7, 2008

_____

Before EASTERBROOK, *Chief Judge*, and BAUER and POSNER,
*Circuit Judges*.

EASTERBROOK, *Chief Judge*.   After *Granholm v. Heald*,
544 U.S. 460 (2005), held that states that allow wineries to
ship direct to consumers may not discriminate against out-
of-state vintners, Indiana revised its statutes. We had

held in *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848 (7th Cir. 2000), that the portions of Indiana's laws there under challenge were non-discriminatory but had flagged other questionable provisions. Indiana eliminated them and revamped the way in which it regulates direct shipments.

Today wineries inside and outside Indiana may ship to customers, if (a) there is one face-to-face meeting at which the buyer's age and other particulars can be verified; and (b) the vintner is not allowed to sell to retailers in any state as its own wholesaler. Indiana also requires wineries to obtain licenses and remit taxes, and it limits each customer to 24 cases per winery per year, but these elements of the state's system have not been challenged. The district court enjoined enforcement of the two contested provisions because they have a disparate impact on out-of-state sellers. 2007 U.S. Dist. LEXIS 64444 (S.D. Ind. Aug. 29, 2007).

A state law that discriminates explicitly ("on its face," lawyers are fond of saying) is almost always invalid under the Supreme Court's commerce jurisprudence, which the Justices recapped this spring in *Department of Revenue of Kentucky v. Davis*, 128 S. Ct. 1801, 1808–11 (2008). (That recent decision makes it unnecessary for us to rehearse the standards.) Plaintiffs, oenophiles who want easier access to wine from small vineyards in other states, do not contend that either of the two challenged provisions discriminates in terms. Every rule applies to every winery, no matter where it is located. The argument instead is that the rules impose higher costs on interstate commerce as a practical matter.

That brings into play the norm that, "[w]here the statute regulates even-handedly to effectuate a legitimate local

public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits*." Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). State laws regularly pass this test, see *Davis*, 128 S. Ct. at 1808–09, for the Justices are wary of reviewing the wisdom of legislation (after the fashion of *Lochner*) under the aegis of the commerce clause. For recent cases in which this circuit has held that *Pike* tolerates state laws of dubious benefit, see, e.g., *Cavel International, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007); *National Paint & Coatings Ass'n v. Chicago*, 45 F.3d 1124 (7th Cir. 1995).

One of the two provisions challenged here is indeed a needless and disproportionate burden on interstate commerce. The wholesale clause in Ind. Code §7.1-3-26-7(a)(6) provides that a winery may sell direct to consumers only if it "does not hold a permit or license to wholesale alcoholic beverages issued by any authority" and is not owned by an entity that holds such a permit. Indiana says that this clause is designed to protect the state's "three-tier system" under which retailers may buy their inventory only from wholesalers. If a wholesaler in another state could sell wine direct to consumers, the state insists, the winery-to-wholesaler-to-retailer-to-consumer model would collapse.

State laws that regulate the distribution chain, as this one does, have been sustained against other challenges under the commerce clause. See *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978). But the Court concluded in *Exxon* that Maryland's separation of the retail and wholesale functions did not affect interstate commerce in petroleum, all of which came from out of state no matter how

the distribution system was organized. Indiana's wholesaler clause, by contrast, prevents direct shipment of almost all out-of-state wine while allowing all wineries in Indiana to sell direct. That happens because states organize their distribution systems differently. Although Indiana forbids any winery to sell to a retailer, many other states either forbid wholesaling or are indifferent to where retailers get their inventory. California, Oregon, and Washington, which produce 93% of this nation's wine, have two-tier systems in which retailers buy from producers without a middleman. All wineries in those states lawfully may sell to retailers—which means that Indiana classifies them as wholesalers and will not allow them to ship wine to customers in Indiana. The statute is neutral in terms, but in effect it forbids interstate shipments direct to Indiana's consumers, while allowing intrastate shipments.

Indiana does not defend the wholesale clause, though a trade association, which intervened to protect its economic interest, insists that the clause is valid. *Pike* asks whether the putative local benefits could possibly justify the burden on interstate commerce. All the wholesalers can muster in support of the statute is that the three-tier system may help a state collect taxes and monitor the distribution of alcoholic beverages, because there are fewer wholesalers than there are retailers, so state enforcement efforts can focus on the middle layer. That may be so, see *Granholm*, 544 U.S. at 489 (stating in dictum that the three-tier system is compatible with the dormant commerce clause), but once a state allows any direct shipment it has agreed that the wholesaler may be bypassed. It is no harder to collect Indiana's taxes from a California winery that sells to California retailers than

from one that does not. The wholesale clause protects Indiana's wholesalers at the expense of Indiana's consumers and out-of-state wineries.

Analysis of the law's other requirement is more complex. Indiana requires any consumer who wants to receive direct shipments of wine—from any winery, in or out of Indiana—to visit the winery once and supply proof of name, age, address, and phone number, plus a verified statement that the wine is intended for personal consumption. See Ind. Code §§ 7.1-3-26-6(4), 7.1-3-26-9(1)(A). The parties call this the face-to-face clause. Plaintiffs say that a face-to-face meeting is more expensive, the farther away is the winery (so the law has a disparate impact on interstate commerce), and that local benefits are negligible because people under 21 are bound to find some way to get hold of wine no matter what the law provides (they could, for example, present forged credentials or bribe sellers to overlook their youth).

Any balancing approach, of which *Pike* is an example, requires evidence. See *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981). It is impossible to tell whether a burden on interstate commerce is "clearly excessive in relation to the putative local benefits" without understanding the magnitude of both burdens and benefits. See *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28 (1st Cir. 2007). Exact figures are not essential (no more than estimates may be possible) and the evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under *Pike*.

The vital bit of information for the wholesale clause is that 93% of all wine comes from states that have two-tier systems. Indiana concedes as much and does not proffer any local benefit to offset the exclusionary effect. But

Indiana has not conceded that it is particularly costly for consumers to visit wineries on the west coast, or that an effort to verify buyers' ages is worthless. Plaintiffs have waged the suit as a "facial" challenge to the statute—which means that Indiana receives the benefit of any plausible factual suppositions, for a statute is not unconstitutional "on its face" if there is any substantial possibility that it will be valid in operation. See, e.g., *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184 (2008). When some form of heightened scrutiny applies—as it does if a law's own terms treat in-state and out-of-state producers differently—then the burdens of production and persuasion rest on the state. But when challenging a law that treats in-state and out-of-state entities identically, whoever wants to upset the law bears these burdens.

The costs of a face-to-face meeting depend on distance, not on borders, and many consumers in Indiana are closer to some wineries in Michigan or Illinois than to most wineries in Indiana. But then plaintiffs aren't interested in wine from Illinois, Michigan, Kentucky, or Ohio. They have their hearts set on the boutique wineries of California, Oregon, and Washington, which are materially farther away.

Plaintiffs invite us to think of a trip to California for the sole purpose of signing up at a single vintner. Yet one winery per trip is not the only, or apt to be the usual, way to satisfy the face-to-face requirement. Many oenophiles vacation in wine country, and on a tour through Napa Valley to sample the vintners' wares a person could sign up for direct shipments from dozens of wineries. Wine tourism in Indiana is less common, and the state's vineyards—which altogether have fewer than 350

acres under cultivation—are scattered around the state, making it hard for anyone to sign up at more than a few of Indiana's wineries. Wineries of Indiana, a trade association, has a map showing its 40 members' locations. See http://www.indianawines.org/wineries/?loc=map. These wineries are all over the map. A connoisseur might well find it easier to visit and sign up at 30 California wineries than at 30 Indiana wineries. So although it may be more costly for a person living in Indianapolis to satisfy the face-to-face requirement at five Oregon wineries than at five Indiana wineries, it is not necessarily substantially more expensive (per winery) to sign up at a larger number of west-coast wineries than at an equivalent number of Indiana wine producers.

If it turns out to be more expensive (per winery) to sign up in California than in Indiana, is the extra cost justified by the wineries' ability to check the credentials of potential buyers? Plaintiffs and several *amici curiae* supporting them maintain that age verification when the wine is delivered is enough. But we know from *Rowe v. New Hampshire Motor Transport Ass'n*, 128 S. Ct. 989 (2008), that states cannot require interstate carriers to verify the recipients' age. Even if that case had come out the other way—or if some carriers offer an age-checking service without the need for legal compulsion—a rushed driver is unlikely to take as much care in checking credentials, and testing for forgery with ultraviolet light and other methods, as a winery's desk clerk. Some drivers treat anyone 18 and over as an "adult", see Staff of the Federal Trade Commission, *Possible Anticompetitive Barriers to E-Commerce: Wine* 36 (2003); no winery would do so. The FTC's staff concluded that data do not reveal "how often couriers obtain a valid adult signature*." Ibid*.

Plaintiffs concede that keeping alcohol out of minors'
hands is a legitimate, indeed a powerful, interest. Still, they
want us to take judicial notice that minors who are deter-
mined to drink will find a way to beat any system, so that
there is no point in *having* a "system" in the first place.
That's not at all clear. How well any given system of
screening works is an empirical subject on which we
lack reliable information. As we observed in *National
Paint*, a legal system need not be foolproof in order to
have benefits. The face-to-face requirement makes it
harder for minors to get wine. Anything that raises the
cost of an activity will diminish the quantity—not to zero,
but no law is or need be fully effective.

According to plaintiffs, Internet-based age-verification
services are as effective as verification in person. The main
support offered for this proposition is an assertion on one
provider's web site that it achieves 94% accura-
cy in matching data to people of known ages. See http://
www.choicepoint.com/products/age_verification.html?
l2=verification_authentication&bc=bva&sb=b. Yet neither
the record in this case nor any third-party testing of the
web site's accuracy shows whether its assertion is correct
or how easy it is for teenagers to supply data that pro-
duces a spurious match to an adult.

Plaintiffs also point to two reports that, they say, estab-
lish the ineffectiveness of in-person age verification. See
the FTC's Staff Report (above) and National Research
Council, Institute of Medicine, *Reducing Underage Drinking:
A Collective Responsibility* (2004). These reports do not
support plaintiffs' contention. What they show instead
is that state officials "report few problems" and the like.
That subjective, unquantified reaction (perhaps it shows
that the officials haven't searched for problems, or that no

adverse stories have appeared in local newspapers) is not enough to override a state legislature's assessment. The FTC's staff also reported that, in tests of the verification system in liquor stores, minors were able to buy alcoholic beverages between 15% to 30% of the time. *Possible Anticompetitive Barriers* 35. That's a far cry from proof that face-to-face verification at a winery would be ineffective or unimportant. Even though it does imply that minors who visit enough stores (or enough wineries) are likely to be accepted eventually at one or more of them, the need to visit multiple outlets raises the cost and so reduces sales to minors. Remove the verification requirement from direct shipments, and more minors would turn to that source. It is important to remember that we are dealing with effects on the margin; make it easier for minors to get wine by phone or Internet, and sales to minors will increase.

Indiana thinks that in-person verification with photo ID helps to reduce cheating on legal rules, for both buying wine and voting (and perhaps other subjects). After the Supreme Court held in *Crawford v. Marion County Election Board*, 129 S. Ct. 1610 (2008), that a belief that in-person verification with photo ID reduces vote fraud has enough support to withstand a challenge under the first amendment, it would be awfully hard to take judicial notice that in-person verification with photo ID has no effect on wine fraud and therefore flunks the interstate commerce clause.

Given the state of this record, and the state of the empirical literature, we know very little. What we can guess at implies that face-to-face verification will reduce the fraction of all wine shipments that go to minors, though the size of this effect is hard to estimate. Minors who

can get beer locally may not want to pay for costly, up-market wine plus shipping charges; if so (and we don't know whether it is so), then Indiana may come to conclude that age verification for direct shipments is not vital. The cost of verification per winery rises with distance, if consumers sign up at only one winery per trip; but when traveling through wine country consumers may be able to sign up at many wineries at small incremental cost. So both the marginal cost and the marginal benefit of Indiana's face-to-face system may be modest. That is not enough to declare a law unconstitutional—not when the effect on interstate commerce is negligible.

Indiana has not tried to keep wine from crossing its border. Go to a liquor outlet in Indiana, and you will find wines from California, Oregon, Washington, France, Germany, Italy, Australia, South Africa, and Chile—but little if any wine from Indiana. It is possible that the face-to-face clause benefits small Indiana wineries near the state's population centers but lacking wholesale distributors, vis-à-vis small California wineries that lack wholesale distributors in Indiana, but Indiana's system does not disadvantage California (or other) wineries in general. The law's principal effect may be to boost larger California (Oregon, etc.) wineries, which have established distribution systems, over smaller wineries from any state, including Indiana, that do not have wholesale distributors.

None of the plaintiffs contends that Indiana's law has led him to buy more wine from Indiana and less from other states. The law simply shifts sales from smaller wineries (in all states, including Indiana) to larger wineries (all of which are located outside Indiana). The Indiana Wine-growers Guild has filed a brief as *amicus curiae* opposing

the face-to-face clause, which the Guild maintains has made it unduly difficult for its members to ship their wine direct to consumers. But if what the Guild says is true, then the statute—although bad economically for Indiana's wineries—must be sustained against a challenge under the commerce clause. Favoritism for large wineries over small wineries does not pose a constitutional problem, and the fact that all Indiana wineries are small does more to show that this law's disparate impact cuts *against* in-state product than to show that Indiana has fenced out wine from other jurisdictions.

The judgment of the district court with respect to the wholesale clause is affirmed, and with respect to the face-to-face clause is reversed. The case is remanded for the entry of a judgment consistent with this opinion.