In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 21-2068

CHICAGO WINE CO., *et al.*,

*Plaintiffs-Appellants*,

*v.*

MIKE BRAUN, Governor of Indiana; THEODORE ROKITA, Attorney General of Indiana; and JESSICA ALLEN, Chairwoman of the Indiana Alcohol and Tobacco Commission,

*Defendants-Appellees*,

*and*

WINE AND SPIRITS DISTRIBUTORS OF INDIANA,

*Intervening Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-02785-TWP-MG — **Tanya Walton Pratt**, *Judge*.

_____

ARGUED DECEMBER 10, 2021 — DECIDED AUGUST 5, 2025

_____

Before EASTERBROOK and SCUDDER, *Circuit Judges*.[*]

PER CURIAM. Before the court is a constitutional challenge
to provisions of Indiana law that prevent retailers of alcoholic
beverages located outside the State from shipping wine to In-
diana consumers. The Chicago Wine Company, an Illinois
wine retailer, brought suit against several Indiana officials,
contending that the regulatory scheme violates the Constitu-
tion by discriminating against interstate commerce.

The district court entered summary judgment for the state
officials, and Chicago Wine appeals.

We affirm on two different lines of reasoning. Attached to
this opinion are separate opinions in which Judges Easter-
brook and Scudder explain their views.

AFFIRMED

---

[*] Circuit Judge Kanne, a member of the panel at the time of argument,
died on June 16, 2022. This appeal is being decided by a quorum. 28 U.S.C.
§46(d).

EASTERBROOK, *Circuit Judge*, concurring. Chicago Wine, a retailer licensed to sell alcoholic beverages in Illinois, wants to ship its inventory into Indiana too. Its first preference is to do this by common carrier, which would enable it to achieve statewide distribution. If that is not possible, Chicago Wine contends, it should be allowed to use its own trucks, which deliver in the Chicago area and could extend their service to northwest Indiana. According to Chicago Wine and three oenophiles who have joined its suit, the Commerce Clause of the Constitution blocks Indiana's restrictions. But the district court granted summary judgment to Indiana (as I call the defendants collectively). 532 F. Supp. 3d 702 (S.D. Ind. 2021).

The parties have devoted a lot of attention to the interaction of the Dormant Commerce Clause with Section 2 of the Twenty-First Amendment, which grants states regulatory power over the importation of alcohol from other states. I need not enter that debate. To simplify the analysis, I assume without deciding that, after *Tennessee Wine & Spirits Retailers Association v. Thomas*, 588 U.S. 504 (2019), and *Granholm v. Heald*, 544 U.S. 460 (2005), all discrimination against out-of-state suppliers is forbidden. The essential question turns out to be whether Indiana discriminates. If not, Chicago Wine lacks a good claim no matter what constitutional rules apply to the interstate distribution of alcohol. (As far as I can see, the Supreme Court has never held that *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), requires or allows a federal court to review the wisdom of a nondiscriminatory regulation of alcohol. Nondiscriminatory state laws may be enforced under §2 of the Twenty-First Amendment without further ado.)

I start with Chicago Wine's preferred outcome: ability to ship alcohol by common carrier. Its problem is that Indiana

does not permit *any* retailer to deliver via common carrier. Retailers licensed to sell alcoholic beverages may use their own staff to deliver their wares but not hand off their products to third parties. See Ind. Code §§ 7.1-3-10-4, 7.1-3-15-3, and 7.1-5-11-1.5(a), which collectively authorize the issuance of permits allowing the staff of any retail liquor store to deliver alcohol. Common carriers may be used to deliver alcoholic beverages to licensed wholesalers but not retail customers. This restriction on who may receive deliveries is an aspect of a three-tier distribution system, a setup that the Supreme Court deems valid. *Tennessee Wine*, 588 U.S. at 534–35 (dictum).

Indiana allows delivery to consumers via common carrier by anyone with a "Direct Wine Seller's Permit", which is available to any wine producer in the United States that holds a federal license and is authorized to sell wine in its home state. Ind. Code §7.1-3-26-7. The upshot is that any wine *producer* (in or out of Indiana) can ship by common carrier to consumers in Indiana, but that no *retailer* (in or out of Indiana) may do so. This structure has been challenged and sustained as nondiscriminatory. See *Baude v. Heath*, 538 F.3d 608 (7th Cir. 2008); *Lebamoff Enterprises, Inc. v. Huskey*, 666 F.3d 455 (7th Cir. 2012) (*Lebamoff Indiana*). None of the state statutes relevant to the use of common carriers has changed materially since *Lebamoff Indiana*, and I do not think that any change in constitutional doctrine requires me to revisit those decisions.

Still, Chicago Wine insists, it should be allowed to send its own employees to deliver wine in northwest Indiana, just as any wine store in Hammond or Gary could do. Once again, however, Chicago Wine can't show that state law discriminates against businesses from other states. True, Indiana permits sales and deliveries only by licensed retailers. Ind. Code

§7.1-5-10-5(a). Indiana used to have a statute limiting retail liquor licenses to persons who had lived there for five years, but that law, which was inconsistent with *Tennessee Wine*, was blocked by *Indiana Fine Wines & Spirits, LLC v. Cook*, 459 F. Supp. 3d 1157 (S.D. Ind. 2020), and rescinded shortly after the district court issued its opinion in this case. Ind. Code §7.1-3-21-3 (repealed effective July 1, 2021). Chicago Wine today is entitled to obtain a license if it meets the standards that apply to citizens of Indiana. So although Indiana stated in the district court that Chicago Wine could not open a retail store in the state, that concession rested on a statute since repealed, which removes the discrimination.

One obstacle Chicago Wine still would face is the requirement that it have premises in Indiana. Indiana apparently does not have a statute to that effect, but it conceded in the district court that its "licensing standards … include maintaining a physical presence in Indiana." The number of licenses available in any geographic area depends on that area's population. Ind. Code §7.1-3-22-3. So if northwest Indiana is license-limited by this statute, Chicago Wine would need to buy an existing dealer. If the area is not license-limited, it could rent a storefront and apply for a license. In either event the physical-presence requirement is nondiscriminatory. It applies equally to a citizen of Indiana.

Chicago Wine protests that it does not *want* to open another retail location, which it deems needlessly expensive. It wants to deliver from the stores it already operates in Illinois. Again, however, Chicago Wine is treated just the same as a Hoosier with a store in Indianapolis or Lafayette who wants to make local deliveries in northwest Indiana. That person, too, must open or buy a retail location in the northwest of the

state in order to avoid uneconomically long delivery routes; that retailer, no less than Chicago Wine, would prefer a cheaper alternative. Likewise a citizen of Indiana living in Hammond who wants to deliver wine would be burdened by the need to open what seems an unnecessary retail store. But state laws that impose costs equally on in-state and out-of-state citizens and their businesses are nondiscriminatory for the purpose of the Dormant Commerce Clause.

We held in *Lebamoff Enterprises, Inc. v. Rauner*, 909 F.3d 847 (7th Cir. 2018) (*Lebamoff Illinois*), that a challenge to an in-state-physical-presence rule survived dismissal for failure to state a claim, so the state had to show that its system was nondiscriminatory. Indiana has done just that. Nothing in *Lebamoff Illinois* prevents a state from receiving a favorable decision once the demonstration has been made. Indeed, *Lebamoff Illinois* implies that a state's nondiscriminatory enforcement of a three-tier distribution system satisfies the Constitution, as *Tennessee Wine* confirms.

At least four other circuits have rejected arguments similar to those of Chicago Wine. See *Lebamoff Enterprises, Inc. v. Whitmer*, 956 F.3d 863 (6th Cir. 2020) (*Lebamoff Michigan*); *Sarasota Wine Market, LLC v. Schmitt*, 987 F.3d 1171 (8th Cir. 2021); *Day v. Henry*, 129 F.4th 1197 (9th Cir. 2025); *Jean-Paul Weg LLC v. New Jersey Division of Alcoholic Beverage Control*, 133 F.4th 227 (3d Cir. 2025). Although *Block v. Canepa*, 74 F.4th 400 (6th Cir. 2023), concluded that the situation in Ohio may be different from that in Michigan (covered in *Lebamoff Michigan*), requiring more litigation, I am satisfied that Indiana's rules are not discriminatory.

To the extent that *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214 (4th Cir. 2022), finds a wine-delivery system to be discriminatory

just because of a retail-premises requirement, and then sustains it anyway despite *Tennessee Wine*, I am skeptical. After *Tennessee Wine* a trans-border delivery rule that discriminates against interstate commerce is forbidden. (Recall from page 3 how I am reading *Tennessee Wine*.) But for the reasons I have explained, Indiana's retail-premises requirement does not discriminate by either the source of the beverages or the state citizenship of the proprietor.

SCUDDER, *Circuit Judge*, concurring in the judgment. The Chicago Wine Company, a Chicago-based retailer of fine wines, wants to sell its wares to consumers in Indiana. But Indiana law prevents out-of-state wine retailers from shipping wine into the State by common carrier as well as delivering it to customers using their own trucks and employees. Joined by several Indiana consumers, Chicago Wine brought suit against the Governor of Indiana and other state officials. The company claims that the State's regulatory scheme violates the Constitution by discriminating against interstate commerce.

The district court entered summary judgment for the state officials, and Chicago Wine now appeals. Like Judge Easterbrook, I too would affirm. I reach that conclusion by a different path of reasoning, however.

**I**

A

A brief overview of Indiana's statutory scheme helps to frame Chicago Wine's constitutional challenge. Like many States, Indiana regulates the importation, distribution, and consumption of alcohol, including wine, through a three-tier system. The State issues different licenses—what the Indiana Code calls "permits"—to producers, wholesalers, and retailers of alcoholic beverages. As a general matter, producers may sell only to licensed wholesalers. Wholesalers, in turn, may purchase alcoholic beverages from producers and other wholesalers, and then sell them to licensed retailers. Finally, retailers may purchase alcoholic beverages from wholesalers and sell them to consumers at retail locations and, subject to certain conditions, through home delivery. The primary

"purposes" of this system, the Indiana General Assembly has declared, are to "protect the economic welfare, health, peace, and morals of the people of this state," "regulate and limit the manufacture, sale, possession, and use of alcohol and alcoholic beverages," and "provide for the raising of revenue." Ind. Code § 7.1-1-1-1.

The State implements this three-tier system through a complex series of alcohol regulations contained in the Indiana Code. One provision makes it unlawful for anyone to "ship … an alcoholic beverage directly to a person in Indiana who does not hold a valid wholesaler permit." *Id.* § 7.1-5-11-1.5(a). Subject to a limited exception for specially permitted domestic wine producers, all wine shipped into Indiana must pass through licensed wholesalers. But this provision of Indiana law does not expressly say whether retailers can use their own employees and vehicles to self-deliver wine to customers at their homes or businesses. (I refer to this as self-delivery to distinguish it from shipping wine for delivery by a common carrier—think FedEx, UPS, and the like.)

Another provision fills that gap. It bars any person from, more broadly, "transport[ing], ship[ping], barter[ing], giv[ing] away, exchang[ing], furnish[ing], or otherwise handl[ing]," an alcoholic beverage in Indiana "for purpose of sale" except as specifically authorized by the Code. *Id.* § 7.1-5-10-5(a). Section 7.1-3-15-3(d) provides one such authorization. It allows the holder of a wine dealer's permit to "deliver wine" to a customer's residence or office so long as the delivery is "performed by the permit holder or an employee who holds an employee permit." But the State concedes that this permit is available only to in-state retailers and thus not to out-of-state retailers.

Two observations stand out from this overview: *First*, Indiana generally prohibits direct shipment of wine to Indiana consumers by out-of-state and in-state retailers alike. *Second*, licensed in-state retailers may self-deliver wine to Indiana consumers, so long as they use their own, separately permitted employees, but out-of-state retailers cannot.

B

Chicago Wine wants to sell and deliver wine to consumers in Indiana. But it is unable to do so because the company is not a permitted retailer in the State. Chicago Wine invoked 42 U.S.C. § 1983 and filed suit in federal court in Indianapolis, alleging that Indiana's restrictions discriminate against interstate commerce by imposing differential treatment on companies' ability to sell products in Indiana based on their physical presence in the State. See *Dennis v. Higgins*, 498 U.S. 439, 440 (1991) (holding that the Commerce Clause confers a right actionable under § 1983).

The district court entered summary judgment for the state officials (and, by extension, for Indiana), concluding that the scheme is not discriminatory and, in any event, reflects a valid exercise of the State's authority to regulate alcohol pursuant to the Twenty-first Amendment. Chicago Wine now appeals.

We review the district court's award of summary judgment by taking a fresh look at the facts and law, drawing all reasonable inferences from the record in favor of Chicago Wine as the non-moving party. See *Davis v. Rook*, 107 F.4th 777, 780 (7th Cir. 2024).

**II**

"[T]his case turns on the accordion-like interplay of two provisions of the United States Constitution." *Lebamoff Enters.*

*Inc. v. Whitmer*, 956 F.3d 863, 869 (6th Cir. 2020) (*Lebamoff Michigan*). The first is the Commerce Clause. The Constitution extends to Congress the power to "regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. But the Supreme Court has long interpreted the Clause to contain a "dormant" or "negative" component, which "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). This restraint on state action applies "even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). And a "finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (citations omitted).

In the typical case, our own Commerce Clause precedents place state laws into one of three categories, depending on the degree to which they affect interstate commerce. The first category comprises "laws that expressly discriminate against interstate commerce." *Regan v. City of Hammond*, 934 F.3d 700, 703 (7th Cir. 2019). "Discrimination" in this context "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (quoting *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994)). A state law found to be discriminatory is "subject to a 'virtually *per se* rule of invalidity,' which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *Id.* at 338–39 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

In the second category are laws that appear neutral on
their face but bear more heavily on interstate commerce than
on local commerce. See *Regan*, 934 F.3d at 703. A law falling
into this category is analyzed according to its effect: "'[W]hen
the effect is powerful, acting as an embargo on interstate com-
merce without hindering intrastate sales,' the law is treated as
the equivalent of a facially discriminatory statute." *Park Pet
Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir. 2017)
(quoting *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d
1124, 1131 (7th Cir. 1995)). But "if the law regulates even-
handedly and only incidentally burdens interstate com-
merce," then we examine it "under the balancing test set forth
in *Pike v. Bruce Church, Inc.* to determine whether it is ani-
mated by a legitimate public purpose and, if so, whether the
burden the law imposes on interstate commerce is excessive
in relation to that interest." *Regan*, 934 F.3d at 703 (citing 397
U.S. 137, 142 (1970)).

In the third category come "laws that may have a mild ef-
fect on interstate commerce but in practice do not give local
firms any competitive advantage over firms located else-
where." *Id.* We examine a law falling into this category "solely
to determine whether it has a rational basis." *Id.*

But this three-category framework has less force where, as
here, a dormant Commerce Clause challenge involves state
alcohol regulations. In such cases, the Supreme Court has di-
rected "a different inquiry." *Tenn. Wine*, 588 U.S. at 539. This
different approach gives effect to the second constitutional
provision implicated by Chicago Wine's challenge: Section 2
of the Twenty-first Amendment. This provision provides that
"[t]he transportation or importation into any State … for de-
livery or use therein of intoxicating liquors, in violation of the

laws thereof, is hereby prohibited." U.S. Const. amend. XXI, § 2.

Section 2, the Supreme Court has emphasized, grants States broad power over "whether to permit importation or sale of liquor and how to structure the liquor distribution system," *Granholm v. Heald*, 544 U.S. 460, 488 (2005) (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 110 (1980)), while also "giv[ing] each State the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens," *Tenn. Wine*, 588 U.S. at 539.

But § 2 does have its limits: the Amendment "does not license the States to adopt protectionist measures with no demonstrable connection" to state interests or "confer limitless authority to regulate the alcohol trade." *Id.* at 538–39. To police these boundaries operating at the interplay between the Commerce Clause and the Twenty-first Amendment, the Supreme Court in *Tennessee Wine* adopted a two-step framework for evaluating alcoholic beverage control laws challenged under the dormant Commerce Clause.

We first ask whether the challenged regulation discriminates against interstate commerce. See *id.* at 539. If not, the inquiry (at least under current law) proceeds to *Pike* balancing. More on this later. But if the law does discriminate, the inquiry shifts to whether "the challenged [regime] can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id*. If the answer to this second question is also yes, the regulation survives. But if the "predominant effect of [the] law is protectionism, not the protection of public health or safety, it is not shielded by § 2." *Id.* at 539–40.

## III

With these principles established, the next step is to apply them to the contested aspects of Indiana's regulatory scheme, beginning with the provisions governing a retailer's ability to self-deliver wine to consumers.

### A

Indiana prohibits the sale or purchase of alcohol except as permitted by the State's Alcohol and Tobacco Code. See Ind. Code § 7.1-5-10-5. The Code defines a "permit" as "a written authorization issued by the [Indiana Alcohol and Tobacco Commission] entitling its holder to manufacture, rectify, distribute, transport, sell, or otherwise deal in alcoholic beverages." *Id.* § 7.1-1-3-29(a). As relevant here, the Indiana General Assembly has authorized a permit that allows certain—but not all—wine retailers to self-deliver wine to consumers.

Section 7.1-3-15-1 empowers the Commission to issue a "wine dealer's permit," which licenses a retailer to "sell wine for consumption off the licensed premises," *id.* § 7.1-3-15-3(a). The holder of a wine dealer's permit "may deliver wine" to a customer's "residence" or "office" so long as the delivery does not occur by common carrier but instead is "performed by the permit holder or an employee who holds an employee permit." *Id.* § 7.1-3-15-3(d); see also *id.* § 7.1-3-18-9(a)(4) (authorizing the Commission to issue an "employee's permit" allowing the employee of a licensed wine dealer to deliver wine).

To obtain an employee permit, the State tells us, an employee must undergo training and testing on Indiana's alcohol laws, including age determination and recognition of fake IDs. And the deliveries must involve a direct, face-to-face encounter between the customer and a retailer's licensed

employee—requirements designed to verify both the consumer's age and sobriety.

B

Nothing about these observations suggests that Indiana's scheme discriminates against out-of-state wine interests. A retailer who holds an Indiana wine dealer's permit may self-deliver wine to consumers while a retailer who lacks such a permit may not. On its face, then, the regime is neutral.

But evidence in the summary judgment record reveals a different regulatory reality. Indiana acknowledged during discovery that an out-of-state retailer like Chicago Wine cannot acquire the permit necessary to engage in deliveries to Indiana consumers. The Commission, Indiana explains, "is not currently processing retailer permit applications from applicants from out-of-state." And "[a]ny application [for a permit]," the State continues, "would need to meet Indiana's licensing standards, which would include maintaining a physical presence in Indiana." Leaving nothing to doubt, the State underscored in its brief that "Indiana law authorizes retail permits only for premises physically located in Indiana."

An "in-state presence requirement" of this type runs contrary to the principle that "States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Granholm*, 544 U.S. at 475 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)). Indiana prohibits out-of-state retailers from acquiring the necessary permit that would allow them to lawfully engage in the same activities—self-deliveries to Indiana consumers—as in-state retailers. The regulatory scheme, in short, discriminates in its

practical effect on retailers, operating as a complete ban on self-deliveries of wine by out-of-state retailers.

C

The State and Judge Easterbrook offer a different perspective. They see Indiana's regime as nondiscriminatory because, in their view, it applies equally to in-state and out-of-state businesses. When it comes to making local deliveries in, for example, northwest Indiana, my colleague explains, Chicago Wine is treated the same as a retailer with a store in Indianapolis: the out-of-state and in-state retailer each must open a retail location in northwest Indiana to make self-delivery services there economically feasible.

Fair enough on the economics. But whether each retailer could turn a profit does not answer the legal question before us. What matters is that the retail store in Indianapolis is legally authorized to make self-deliveries in northwest Indiana, whereas Chicago Wine would face criminal penalties for doing so. See Ind. Code § 7.1-5-10-5(c). It is in that important way that Indiana's scheme treats them differently. See *Lebamoff Enters., Inc. v. Rauner*, 909 F.3d 847, 852 (7th Cir. 2018) (*Lebamoff Illinois*) (finding discrimination where the regulatory scheme "allow[ed] in-state retailers to obtain a license to ship their products anywhere in the state" but "prohibit[ed] out-of-state retailers from obtaining an analogous license").

Remember, too, that the Supreme Court has told us that a state law is "no less discriminatory" because in-state businesses "are also covered by [it.]" *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); see also *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951). The regulatory scheme before us, like the ordinance in *Carbone*, provides a

preference to "favored operator[s]" in Indiana—those with a retail location in the State—and deprives out-of-state retailers like Chicago Wine the opportunity to compete for wine sales on the same terms. 511 U.S. at 390–91. Indeed, as in *Carbone*, while the scheme "may not in explicit terms seek to regulate interstate commerce, it does so nonetheless by its practical effect and design." *Id.* at 394.

Even more on point, in *Granholm* the Supreme Court rejected the precise argument that the State presses here. There the Court reviewed a licensing scheme that allowed out-of-state wineries to ship wine directly to consumers only if they opened an in-state branch office and warehouse. See *Granholm*, 544 U.S. at 474–75. That regime, like Indiana's, conditioned the receipt of a license on a business having a physical presence in the State. See *id.* Yet the Justices had "no difficulty" concluding that this in-state presence requirement discriminated against interstate commerce and, from there, subjected it to heightened scrutiny. See *id.* at 476.

## D

Having found that Indiana's differential treatment of in-state and out-of-state retailers with respect to wine self-deliveries is discriminatory, the next step is to determine whether § 2 of the Twenty-first Amendment justifies the discrimination.

Recall that, under *Tennessee Wine*, an alcohol regulation that discriminates against interstate commerce may nevertheless be saved if it "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." 588 U.S. at 539. To demonstrate as much, the State may not rely on "mere speculation" or "unsupported

assertions" but, rather, must offer "concrete evidence" show-
ing that the main effect of the law is to address "the public
health and safety effects of alcohol use." *Id.* at 538–39 (quoting
*Granholm*, 544 U.S. at 490, 492).

For its part, Indiana urges an altogether different analysis.
Where, as here, a challenged regulation is an "essential fea-
ture" of a State's three-tiered system (separating producers,
wholesalers, and retailers of alcoholic beverages), Indiana
contends that the provision is "categorically authorized by
the Twenty-first Amendment." Put another way, Indiana sees
the test from *Tennessee Wine* as appropriate only when the
State has created an exception or modification to the core
components of a three-tier system (like the ones at issue in
*Granholm* and *Tennessee Wine* themselves).

I cannot get there. While the Supreme Court reaffirmed in
*Granholm* that "the three-tier system itself is 'unquestionably
legitimate,'" 544 U.S. at 489 (quoting *North Dakota v. United
States*, 495 U.S. 423, 432 (1990) (plurality opinion)), *Tennessee
Wine* later warned us to not "read[] far too much into
*Granholm*'s discussion of the three-tiered model." 588 U.S. at
535. Section 2, the Court emphasized, does not "sanction[]
every discriminatory feature that a State may incorporate into
its three-tiered scheme" and "each variation must be judged
based on its own features." *Id.*; see also *Lebamoff Illinois*, 909
F.3d at 855 (recognizing that there are "serious problems with
reading *Granholm* to protect against discrimination only in the
parts of the three-tier system that are not 'inherent' or 'inte-
gral' to its existence").

It is necessary, then, to look at the specific regulation at
issue and the State's evidentiary showing to support it. See,
*e.g.*, *Anvar v. Dwyer*, 82 F.4th 1, 10–11 (1st Cir. 2023) ("[A]

discriminatory aspect of a state's version of the three-tier system cannot be given a judicial seal of approval premised … on the virtues of three-tier systems generally" but rather "must be supported by 'concrete evidence' demonstrating that its predominant effect advances the goals of the Twenty-first Amendment and not merely the protection of in-state business interests." (quoting *Tenn. Wine*, 588 U.S. at 540)); *Day v. Henry*, 129 F.4th 1197, 1212 (9th Cir. 2025) (Forrest, J., concurring in part and dissenting in part) (concluding that a remand is appropriate where "the district court bypassed the requisite evidentiary weighing and relied on the regulations' perceived centrality to [the State]'s three-tier system").

To be sure, other circuits have latched onto *Tennessee Wine*'s observation that the durational-residency requirement at issue was not an "essential feature of a three-tiered scheme," 588 U.S. at 535, and, from there, have bypassed any weighing of the evidence upon concluding that a law is integral to the State's regime. See, *e.g.*, *Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1183–84 (8th Cir. 2021); *B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 227–29 (4th Cir. 2022). But nowhere did the Court in *Tennessee Wine* suggest it intended to create a carve out to the requirement that States must produce "concrete evidence" that discriminatory regulations serve legitimate interests. To the contrary, the Court took pains to prevent "read[ing] far too much into *Granholm*'s discussion of the three-tiered model." *Tenn. Wine*, 588 U.S. at 535. So to my eye, regardless of whether the physical-presence requirement is "essential" to Indiana's three-tier system, § 2 requires us to determine whether it can be justified as a public health or safety measure.

Indiana asserts that its physical-presence requirement fur-thers the State's legitimate, non-protectionist interests in pro-moting temperance, policing underage drinking, and ensur-ing that its regulatory Commission can effectively enforce al-cohol regulations against those who sell to consumers. The district court agreed, relying on a sworn declaration from an Indiana State Excise Police Sergeant Brian Stewart to conclude that the challenged regime "helps advance the State's inter-ests in keeping alcohol out of the hands of minors, controlling the quantity of alcohol in the State to curtail public health con-cerns, and protecting against unsafe or counterfeit products." *Chicago Wine Co. v. Holcomb*, 532 F. Supp. 3d 702, 714 (S.D. Ind. 2021).

In my view, that declaration, taken with other evidence the State brought forth at summary judgment, provides a suf-ficient basis to conclude that the "challenged laws [are] rea-sonably necessary to protect [Indiana's] asserted interests," *Tenn. Wine*, 588 U.S. at 533.

*Promoting Temperance.* The Supreme Court has recognized as "legitimate" a State's interest in the promotion of "respon-sible sales and consumption practices." *Id.* at 542. And, on the record before us, Indiana has demonstrated that requiring re-tailers to establish a physical presence in the State promotes temperance by controlling the amount of alcohol available for sale to consumers.

Specifically, Indiana law limits the number of retailer per-mits available in a given locality, see Ind. Code §§ 7.1-3-15-2, 7.1-3-22-3, -4, -5, and further restricts how much alcohol may be purchased at one time, see, *e.g., id.* §§ 7.1-3-4-6(c), 7.1-3-9-9(c), 7.1-5-10-20. The State also requires that a county's alco-holic beverage board approve every permit for local retailers.

See *id.* §§ 7.1-3-19-3, -4, -11; see also *id.* § 7.1-2-4-1. Incorporating a role for local boards allows the people to have a voice in the number of retail establishments selling alcohol in their community.

But it is difficult to see how Indiana could preserve local oversight or limits on the number of available permits in any hypothetical process for an out-of-state retailer to obtain a permit. Allowing out-of-state retailers without a physical presence in Indiana to deliver wine and other alcoholic beverages to Hoosiers would undermine these controls and increase the availability of alcohol to individual consumers.

*Ensuring Compliance with State Alcohol Laws.* A physical-presence requirement also furthers the State's interest in enforcing its health and safety regulations against businesses that sell alcohol to consumers. Indiana retailers must make their premises available for inspection. By statute, an applicant for an alcoholic beverage permit "consents" to "the entrance, inspection, and search by an enforcement officer, without a warrant or other process, of [the] licensed premises and vehicles to determine whether [the permittee] is complying with the provisions of [the Alcohol and Tobacco Code]." *Id.* § 7.1-3-1-6. Indiana law enforcement authorities, including the State Excise Police, use this authority routinely to inspect and investigate retailers located in Indiana.

Indeed, Sergeant Stewart explained that the Excise Police sets a goal of conducting an annual "permit visit" to at least 75% of alcoholic beverage retailers, with officers performing these visits on a "fairly routine" basis. In 2019 alone, the Indiana Excise Police conducted 13,103 permit visits. These inspections enable regulators to conduct underage buys, discover unsafe and counterfeit products, and ensure

compliance with other regulations. The State illustrated the point by supplying the district court with a declaration from another Excise Police officer describing one inspection that revealed a retailer had tampered with shipment labels and committed other violations consistent with an attempt to bootleg alcoholic beverages.

When law enforcement discovers violations like these, the State can suspend or revoke the retailer's permit, cutting off their ability to both buy alcohol from Indiana wholesalers and to sell it to consumers. But the State's ability to detect violations and enforce these laws lessens when it comes to out-of-state retailers. Even if the regulators had jurisdiction to conduct inspections, audits, or sting operations on out-of-state wine retailers' premises, sending law enforcement to these locations around the country would not be feasible. Sergeant Stewart, testifying as the State's representative, see Fed. R. Civ. P. 30(b)(6), explained in his deposition that the Excise Police would be "really restricted in [their] ability to travel out of state and do those physical inspections." Two of the State's retained experts expressed similar concerns in their reports, explaining that issuing permits to out-of-state retailers would impair Indiana regulators' ability to conduct inspections.

One of these experts further described how Indiana lacks enforcement tools to use against out-of-state retailers who violate State law. Hoosier retailers, Dr. William Kerr stated, must abide by the three-tier system, including the requirement that retailers purchase alcohol products from a permitted Indiana wholesaler. And Indiana wholesalers that continue to supply alcohol to an Indiana retailer with a suspended license may face penalties themselves. So, by routing the distribution of alcohol through the three-tier system, State

regulators can block the flow of alcohol to Hoosier retailers. But the State lacks the same ability to shut off supply to non-compliant out-of-state retailers, who shoulder no requirement to purchase alcohol from Indiana wholesalers.

*Combating Underage Drinking.* Similar enforcement difficulties arise in connection with the State's ability to prevent alcohol sales to underage consumers. The Indiana Excise Police, Sergeant Stewart reported in his declaration, aims to conduct underage-buy investigations at 100% of retail locations each year to ensure that retailers are not selling to minors. But these inspections would be difficult to execute at out-of-state retail locations. Even if the Excise Police could conduct underage-buy operations from retailers within the State at the point where an alcoholic beverage is self-delivered to an Indiana consumer at their home or office, evidence supplied by the State makes clear the importance of inspecting brick-and-mortar retail premises to its regulatory oversight.

States have "the authority to address alcohol-related public health and safety issues in accordance with the preferences of its citizens." *Tenn. Wine*, 588 U.S. at 539. In my view, Indiana's physical-presence requirement finds adequate justification as a public health and safety measure and, therefore, constitutes a permissible exercise of the State's authority under § 2 of the Twenty-first Amendment.

This analysis aligns with Supreme Court precedent. Neither *Granholm* nor *Tennessee Wine* addressed the validity of a physical-presence requirement at the retail level. *Granholm* considered a discriminatory exception to the three-tier system for wine producers: two States allowed in-state wineries to ship wine directly to consumers but prohibited out-of-state wineries from doing the same. See 544 U.S. at 465–66. The

States failed to provide evidence justifying the differential treatment of the wine producers. See *id.* at 490–93. So the Court found the differential treatment unconstitutional. See *id.* at 493.

The challenged physical-presence requirement here, by contrast, is a key element of Indiana's three-tier system. And at summary judgment the State came forward with evidence to demonstrate it furthers Indiana's legitimate interests in health and safety.

So, too, for *Tennessee Wine*. The Court invalidated a two-year durational residency requirement before an individual could obtain a retail license to sell alcohol in the Volunteer State. See *Tenn. Wine*, 588 U.S. at 510–11. But a physical-presence requirement has a much closer nexus to a State's health and safety interests. Indeed, as the Court recognized, a "2-year residency requirement is not needed to enable the State to maintain oversight over liquor store operators" because "the stores at issue are physically located within the State." *Id.* at 541. "For that reason," the Court explained, "the State can monitor the stores' operations through on-site inspections, audits, and the like." *Id.* The ability of law enforcement to conduct on-site inspections of retailers, in my view, distinguishes and justifies Indiana's physical-presence requirement.

My conclusion that the physical-presence requirement is a valid exercise of the State's authority to regulate alcohol pursuant to the Twenty-first Amendment also finds support in the case law of other circuits. Every court of appeals to confront the issue has upheld physical-presence requirements of this sort for retailers of alcoholic beverages. See *Lebamoff Michigan*, 956 F.3d at 876 (Sixth Circuit upholding "the requirement that [a retailer] set up a store within the State—a

physical presence requirement that the U.S. Supreme Court and our court permit"); *Sarasota Wine Mkt.*, 987 F.3d at 1182–84 (Eighth Circuit rejecting challenge to State's requirements that licensed liquor retailers be residents of the State and have a physical presence in the State); *B-21 Wines*, 36 F.4th at 216–17 (Fourth Circuit upholding regime that "prohibits out-of-state retailers—but not in-state retailers—from shipping wine directly to consumers"); *Jean-Paul Weg LLC v. Dir. of N.J. Div. of Alcoholic Beverage Control*, 133 F.4th 227, 236–67 (3d Cir. 2025) (Third Circuit concluding that only authorizing retailers that have a physical presence in the State to ship wine to consumers is "justified both on public health and safety grounds and as an essential feature of [the State's] three-tier system"); *Day*, 129 F.4th at 1201, 1205–06 (Ninth Circuit finding regime to be non-discriminatory where "retailers who do not maintain premises in [the State] cannot ship directly to consumers within the state, but licensed retailers with in-state premises may do so"); *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 190–91 (2d Cir. 2009) (Second Circuit reaching the same conclusion); cf. *Anvar*, 82 F.4th at 10–11 (First Circuit remanding to the district court for "a fuller consideration of the parties' respective offers of proof" as to the "constitutionality of the in-state-presence requirement for retailers").

E

Chicago Wine insists that the State cannot carry its burden because it has failed to demonstrate there are no nondiscriminatory alternatives to the physical-presence requirement. As a legal matter, it is not clear whether the framework applied by the Supreme Court compels consideration of nondiscriminatory alternatives in challenges to state alcohol regulations—as would be required in a typical dormant Commerce Clause

case. Compare *Granholm*, 544 U.S. at 492–93 (drawing upon general dormant Commerce Clause precedent and explaining that discriminatory regulations may be upheld "only after finding, based on concrete record evidence, that a State's non-discriminatory alternatives will prove unworkable"), with *Tenn. Wine*, 588 U.S. at 539–40 (asking "whether the challenged requirement can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground").

To be sure, *Tennessee Wine* does use language considering alternatives. See *id.* at 540 ("[T]he record is devoid of any 'concrete evidence' showing that the 2-year residency requirement actually promotes public health or safety; nor is there evidence that nondiscriminatory alternatives would be insufficient to further those interests." (quoting *Granholm*, 544 U.S. at 490)); *id.* at 542–43 ("Not only is the 2-year residency requirement ill suited to promote responsible sales and consumption practices … but there are obvious alternatives that better serve that goal without discriminating against nonresidents."). But that language comes in connection with the Court's analysis of whether the State presented sufficient evidence that the challenged regulation advances its interests in public health and safety.

So while consideration of nondiscriminatory alternatives may be relevant in some way to the Twenty-first Amendment inquiry, it is far from clear, and definitely not settled, that the legal inquiry demands a showing of no nondiscriminatory alternatives. See *Anvar*, 82 F.4th at 11 ("The district court may find the existence of alternatives relevant in assessing whether the challenged laws in fact promote public health and safety, but the mere existence of possible alternatives does not, for

purposes of a Twenty-first Amendment inquiry, necessarily invalidate a challenged law."); *B-21 Wines*, 36 F.4th at 225–26 ("Although consideration of nondiscriminatory alternatives could have some relevance to [the Twenty-first Amendment] inquiry, it does not transform the applicable framework into the test that ordinarily applies to a dormant Commerce Clause challenge when the Twenty-first Amendment is not implicated."); *Jean-Paul Weg*, 133 F.4th at 238 ("[T]he relevance of nondiscriminatory alternatives is of lessened importance under the *Tennessee Wine* test than in a standard dormant Commerce Clause analysis.").

Even more, I doubt that the consideration of alternatives has a material role to play after *Tennessee Wine*. To insist upon the demonstration of no nondiscriminatory alternatives risks limiting a State's authority conferred by § 2 and, by extension, puts alcoholic beverage regulations on the same plane as ordinary dormant Commerce Clause jurisprudence. But that is precisely what the Court has taken to care to avoid by supplying a "different inquiry" for such cases. *Tenn. Wine*, 588 U.S. at 539.

Taking the State's interests on their own terms, Chicago Wine contends that a physical presence in Indiana is not essential to advancing public health and safety because the State issues direct seller's permits to out-of-state domestic wineries, authorizing them to ship wine directly to Indiana consumers. See Ind. Code §§ 7.1-3-26-5(a), -7. Out-of-state wineries, the argument goes, pose the same problems of long-distance regulation as out-of-state retailers. So requiring an in-state presence—to facilitate inspections and ensure compliance with alcohol laws—cannot be necessary for regulatory oversight.

But the exception for wineries is far from unlimited. Wineries may only ship wine that they produce, see *id.* § 7.1-3-26-9(2)(G), may not ship more than 45,000 liters of wine into Indiana per year, see *id.* § 7.1-3-26-12, and may not ship more than 216 liters of wine per year to any one Indiana consumer, see *id.* §§ 7.1-3-26-9(2)(E), -14. Sergeant Stewart also explained that all wineries are licensed and regulated by the Tax and Trade Bureau of the U.S. Treasury Department, which sets national standards for health and safety that do not exist at the retail level.

The State has further presented evidence that the products offered for direct sale by wineries are not particularly attractive to minors. One of Indiana's experts relied on a study finding that the average bottle price for direct shipment of wine was $40.70 in 2019. Minors, the expert opined, are not known to be connoisseurs of fine wine and instead prefer to consume cheaper alcohol primarily for intoxication. Indeed, as the Supreme Court observed, relying on a report by the Federal Trade Commission, "direct shipping [of wine] is an imperfect avenue of obtaining alcohol for minors who … want instant gratification." *Granholm*, 544 U.S. at 490 (internal quotation marks omitted) (citation omitted).

Finally, it is worth observing that Indiana's exception for wineries is a narrow exception to the State's three-tier system at the producer level, allowing domestic wineries to bypass wholesalers and retailers and sell wine directly to consumers. But Indiana's interest in requiring a physical presence is strongest at the retail level, where the vast majority of alcohol sales to Indiana consumers occur. Indeed, at summary judgment the State explained that it has issued only 464 direct

seller's permits compared to the 8,764 in-state retailers it authorizes to sell wine.

What all this tells us is that Indiana's decision to allow out-of-state wine producers to ship wine to consumers does not materially undermine its interests served by requiring retailers to maintain a physical presence in the State. And there is further reason to believe that the limits on the supply, price, and product type imposed by Indiana law and market forces would give way where out-of-state wine retailers had direct access to consumers—presenting a risk to public health and safety that direct-shipment by wineries does not.

In the final analysis, then, the State's legitimate, non-protectionist interests in promoting temperance, policing underage drinking, and enforcing its alcohol regulations against those who sell to consumers combine to support Indiana's physical-presence requirement for retailers.

## IV

That brings us to Chicago Wine's second, independent challenge to Indiana's regulatory scheme—the prohibition on retailers shipping wine to Hoosier consumers via common carriers.

## A

The parties agree that, aside from the exception afforded to specially permitted domestic wineries, Indiana law forbids the delivery of wine to Indiana consumers by a common carrier for in-state and out-of-state retailers alike. See Ind. Code §§ 7.1-3-15-3(d), 7.1-5-10-5, 7.1-5-11-1.5(a); see also *Lebamoff Enters., Inc. v. Huskey*, 666 F.3d 455, 457 (7th Cir. 2012) (*Lebamoff Indiana*) (concluding that Indiana Code § 7.1-3-15-3(d) forbids in-state retailers from shipping wine to consumers via

common carrier); *Ind. Alcohol & Tobacco Comm'n v. Lebamoff Enters., Inc.*, 27 N.E.3d 802, 813–14 (Ind. Ct. App. 2015) (finding our interpretation of § 7.1-3-15-3(d) in *Lebamoff Indiana* "persuasive").

Everyone further agrees that § 7.1-3-15-3(d), which authorizes an Indiana wine retailer to self-deliver wine to consumers, requires that the delivery be made by either the retail-permit holder or their permitted employee. A delivery made by UPS, then, is not sanctioned by that provision. And everyone also acknowledges that the Code contains no other authorization that would allow either an in-state or out-of-state retailer to use a common carrier to deliver their wine to an Indiana consumer.

B

Because all retailers are forbidden from using common carriers to deliver wine, Indiana's regime in this regard does not explicitly discriminate against interstate commerce. To its credit, Chicago Wine concedes that the common carrier ban is "facially neutral" because it applies to both in-state and out-of-state wine retailers. But Chicago Wine insists that the ban nevertheless bears more heavily on interstate commerce because out-of-state retailers—also unable to self-deliver wine using their employees—have no other way to get their vino to market in Indiana.

When a law "regulates even-handedly and only incidentally burdens interstate commerce, then it is examined under the balancing test set forth in *Pike v. Bruce Church, Inc.*" *Regan*, 934 F.3d at 703 (citing 397 U.S. at 142). "Under the *Pike* test," the Supreme Court has explained, we "uphold a non-discriminatory statute like this one 'unless the burden

imposed on [interstate] commerce is clearly excessive in rela-tion to the putative local benefits.'" *United Haulers*, 550 U.S. at 345–46 (alteration in original) (quoting 397 U.S. at 142) (apply-ing the *Pike* test where the challenged county ordinances did not "'discriminate against interstate commerce' for purposes of the dormant Commerce Clause" because they "treat[ed] in-state private business interests exactly the same as out-of-state ones").

One threshold question regarding the proper framework to analyze Chicago Wine's challenge to the common carrier ban bears emphasis. In *Lebamoff Indiana* we acknowledged that it is unclear whether *Pike* balancing has any "continued applicability" in challenges to laws that fall "within the Twenty-First Amendment's gravitational field." 666 F.3d at 462. The Supreme Court, one of my colleagues observed, has "not used *Pike* balancing to strike down any state alcoholic beverage laws," nor has the Court "signaled that the lower courts should apply *Pike* balancing to alcoholic beverage laws." *Id.* at 467 (Hamilton, J., concurring in the judgment). Section 2, in my colleague's view, should foreclose the *Pike* test "when the state is exercising its core Twenty-first Amend-ment power to regulate the transportation and importation of alcoholic beverages for consumption in the state." *Id.* at 462.

In time the Justices are sure to answer that question. For deciding this case, however, we need not resolve whether *Pike* has a role to play in determining whether a state alcohol reg-ulation violates the dormant Commerce Clause. Assuming the *Pike* test continues to apply in the domain of alcohol reg-ulation, any burden the common carrier ban imposes on in-terstate commerce is not excessive in relation to its benefits.

Before turning to that analysis, however, allow me a word in response to Indiana's separate contention that any challenge to the prohibition on the use of common carriers is foreclosed by our precedent. Judge Easterbrook agrees with the State. See Op. J. Easterbrook at 3 (first citing *Baude v. Heath*, 538 F.3d 608 (7th Cir. 2008); and then citing *Lebamoff Indiana*, 666 F.3d 455). I do not.

*Baude* rejected a dormant Commerce Clause challenge to an Indiana law that required consumers to visit a winery in person (and supply proof of name, age, address, and phone number) before the winery could ship wine to them. See 538 F.3d at 612, 615. But the Indiana General Assembly subsequently removed this aspect of the regulatory scheme by later amendment, thereby eliminating any dormant Commerce Clause infirmity. See Ind. Code §§ 7.1-3-26-6, -9 (as amended by Pub. L. No. 107-2015, §§ 6, 9).

*Lebamoff Indiana* is a closer fit. There an Indiana wine retailer based in Fort Wayne, joined by two wine consumers living in Indianapolis, challenged the law barring the company from shipping alcoholic beverages via common carrier. See *Lebamoff Indiana*, 666 F.3d at 457. The retailer sought to enlarge its sales area to parts of Indiana outside of Fort Wayne—like Indianapolis—where it could not as easily self-deliver wine using its own employees. See *id.* at 462. But that challenge, we explained, concerned "an effect on intrastate commerce, not interstate commerce." *Id.* Without a showing of "even an incidental effect on interstate commerce," we found that the common carrier ban survived *Pike* balancing. See *id.* at 460–62. We did not consider the ban as applied to *inter*state shipping, however.

Here, unlike in *Lebamoff Indiana*, the issue of whether the common carrier ban has an impermissible, discriminatory effect on out-of-state business interests takes center stage. So while *Lebamoff Indiana*'s reasoning is helpful, it does not resolve this case. We must instead take a fresh look at the common carrier ban under *Pike* balancing, this time considering the effect of the restriction on *inter*state commerce.

C

Chicago Wine tells us that much of the wine sold in the United States is available only from out-of-state retailers. These retailers are unable to self-deliver wine to Indiana consumers using their employees and, even if they could obtain a permit to do so, many out-of-state retailers are located far beyond Indiana's borders. Indeed, while Chicago Wine sits just across the Illinois state line, the company complains that it would be cost-prohibitive to self-deliver wine to most Hoosiers. So the effect of the common carrier ban, the company urges, disadvantages out-of-state retailers, who are effectively boxed out of the Indiana wine market.

Analyzing the common carrier ban "on its own," *Tenn. Wine*, 588 U.S. at 539, the measure reflects a reasonable means by which Indiana can prevent the distribution of alcohol to minors—a legitimate state interest. The State, remember, allows the holder of a wine dealer's permit to "deliver wine" to a customer's residence or office so long as the delivery is "performed by the permit holder or an employee who holds an employee permit." Ind. Code § 7.1-3-15-3(d). Delivery drivers employed by retailers must be trained in, and tested on, Indiana's alcohol laws, including age determination and recognition of fake IDs. See *Lebamoff Indiana*, 666 F.3d at 458. As one

of the State's experts opined, effectively detecting fake IDs is difficult and requires training.

"Motor carriers" like FedEx, UPS, and others, by contrast, "are required to obtain 'carriers' alcoholic permits' in order to be allowed to transport alcohol on public highways in Indiana, but their drivers are not required to obtain permits and there is no training requirement either." *Id.* at 459 (citing Ind. Code §§ 7.1-3-18-1 *et seq.*). And, even if the State wanted to, Indiana could not impose upon common carriers the requirements that it mandates for the employees of wine retailers. "[W]e know from *Rowe v. New Hampshire Motor Transport Ass'n* that states *cannot* require interstate carriers to verify the recipients' age." *Baude*, 538 F.3d at 613 (emphasis added) (citing 552 U.S. 364 (2008)).

If Indiana cannot require common carriers to verify the age of a consumer before handing them a package that contains alcohol, then prohibiting retailers—both in-state and out-of-state—from using common carriers is a reasonable means by which the State can endeavor to keep alcohol out of the hands of minors. As we explained in *Lebamoff Indiana*, the State has decided that mandating "face-to-face age verification by someone who has passed a state-certified training course should reduce the prevalence of [underage] drinking," and "[a]llowing motor carriers to deliver wine could therefore undermine the state's efforts to prevent underage drinking." 666 F.3d at 459.

Chicago Wine has not come forward with sufficient evidence to demonstrate that the common carrier ban imposes such a heavy burden on interstate commerce as to overcome the State's legitimate interest in combatting underage drinking. See *Baude*, 538 F.3d at 612–13 (observing that the party

challenging the regulation bears the burden under the *Pike* test). Because any burden it poses is not "clearly excessive in relation to the putative local benefits," *Pike*, 397 U.S. at 142, the common carrier ban, in my view, survives the *Pike* test.

This result sits comfortably alongside decisions reached by other circuits. Several circuits have upheld state laws that forbid only out-of-state retailers from shipping wine by common carrier while allowing in-state retailers to do so. See, *e.g.*, *Lebamoff Michigan*, 956 F.3d at 867–68 (Sixth Circuit); *B-21 Wines*, 36 F.4th at 217, 229 (Fourth Circuit); *Jean-Paul Weg*, 133 F.4th at 231, 237 (Third Circuit); *Day*, 129 F.4th at 1201, 1208 (citing Ariz. Rev. Stat. § 4-203(J)) (Ninth Circuit). Indiana's restriction, by contrast, regulates "on evenhanded terms," *Granholm*, 544 U.S. at 493, and therefore is all the more compatible with the strictures of the dormant Commerce Clause.

For these reasons, I concur in today's judgment.